William H. APTON et al., Appellants,

v.

Jerry V. WILSON (Chief of Police) et al.

Roger S. KUHN et al., Appellants,

v.

Jerry V. WILSON, Individually and as Chief of Police, Metropolitan Police Department, et al.

Nos. 73–1614, 73–1615.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 30, 1974.

Decided Aug. 16, 1974.

MacKinnon, Circuit Judge, concurred and filed opinion.

Wilkey, Circuit Judge, concurred and filed opinion.

John Silard, Washington, D. C., with whom Joseph L. Rauh, Jr., and Elliott C. Lichtman, Washington, D. C., were on the brief, for appellants.

Barbara L. Herwig, Atty., Dept. of Justice, with whom Irving Jaffe, Acting

Asst. Atty. Gen., Harold H. Titus, Jr., U. S. Atty. at the time the brief was filed, and Kathryn H. Baldwin, Atty., Dept. of Justice, were on the brief for federal appellees.

David P. Sutton, Assistant Corp. Counsel, Washington, D. C., for the District of Columbia with whom C. Francis Murphy, Corp. Counsel, and Richard W. Barton, Asst. Corp. Counsel, Washington, D. C., were on the brief, for District of Columbia appellees.

Before LEVENTHAL, MacKINNON and WILKEY, Circuit Judges.

LEVENTHAL, Circuit Judge:

These cases arise from law enforcement activities during the "May Day Demonstrations" of May, 1971, described in Sullivan v. Murphy.[1] That was a class action in which plaintiffs complaining of arrest, detention, fingerprinting, booking, and prosecution without probable cause sought expungement of police records. This court held that a class action was appropriate in light of the extraordinary circumstances of the May Day arrests, for which the police suspended normal post-arrest procedures that ordinarily allow individualized determinations of probable cause; that arrests unaccompanied by the usual indicia of the basis therefor were presumptively invalid; and that the plaintiffs were entitled to expungement of records or reasonably equivalent relief unless the District of Columbia authorities demonstrated probable cause for the arrests.

In the cases at bar, the thirty-four plaintiffs allege that they were arrested at the time of the May Day demonstrations while engaging in entirely lawful and unobjectionable conduct and were thereafter detained, fingerprinted, photographed and booked, notwithstanding the absence of probable cause supporting any charge of unlawful conduct. The plaintiffs seek damages for alleged violations of their Fourth and Fifth Amendment rights and certain equitable relief.

The defendants Mitchell, Kleindienst, and Will Wilson were, at the time of the events in controversy, respectively, the Attorney General of the United States, Deputy Attorney General and Assistant Attorney General, Criminal Division. The defendants Santarelli and Ugast were staff assistants to Attorney General Mitchell. Additional defendants are unidentified officers of the District of Columbia police department, Chief of Police Jerry Wilson, and the District of Columbia. The plaintiffs allege that the Chief of Police and the Justice Department defendants[2] directed the law enforcement activities complained of.

The District Court granted summary judgment in favor of the Justice Department defendants on the ground that they were immune from suit over acts taken in their capacity as executive officials. As to the District of Columbia defendants[3] the District Court certified the lawsuit against them to the Superior Court for the District of Columbia.

On reviewing the doctrine of official immunity, particularly in light of the recent Supreme Court decision in Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), we reverse the District Court's ruling as to the Justice Department defendants. We also hold that it was error to certify the case against the District of Columbia defendants to the Superior Court.

## I. STATEMENT OF FACTS

A. *General Background of the May, 1971 Demonstrations and Ensuing Law Enforcement Activities.*

Beginning in April, 1971, the nation's capital became the scene of numerous demonstrations, marches, and protest ac-

---

1. 156 U.S.App.D.C. 28, 478 F.2d 938 (1973).

2. The defendants Mitchell, Kleindienst, Will Wilson, Santarelli and Ugast will be referred to collectively as the Justice Department defendants.

3. The unnamed officers, Chief of Police, and the District of Columbia are referred to collectively as the District defendants.

tivities designed to focus national attention upon U.S. military involvement in Southeast Asia. In early April, demonstrations were small and sporadic, generating no serious encounters with police. Toward the end of the month, however, as the influx of demonstrators and protesters into the city swelled, tensions between protest activity and public authority mounted, and law enforcement resources became strained. Still, until April 30, protest activities had been directed at only a few government agencies. Some demonstrators were arrested, usually on charges of disorderly conduct or obstruction of building exits, but the Metropolitan Police seemed able to curtail serious disorder and disruption of government activity.

During the weekend of April 30, however, certain protest leaders announced plans to block access to the city during the morning rush hour of Monday, May 2. They designated for obstruction specific locations on the major arteries used by the many Federal employees commuting from Maryland and Virginia suburbs.

Following these announcements, the authorities made plans during the weekend to cope with the threat. Some Federal offices asked employees to volunteer to report for work early on Monday morning. The Metropolitan Police Force was augmented by 4,000 Federal troops and the District of Columbia National Guard was called up for training.

Efforts by protesters to impede commuter traffic into the city did materialize on May 2, but the police and other city personnel deployed were generally able to thwart them. Police, fire, and sanitation department personnel counteracted the protesters' attempts to obstruct streets and bridges by abandoning vehicles, burning trash containers, or strewing nails and glass fragments. On two bridges leading into the city, crowds of demonstrators who charged police lines were repulsed with truncheons and tear gas. Despite some delay traffic did flow into the city, and by the end of the day government officials reported fewer

absences than those expected on an average workday.

The events of the following day, May 3, have been described in detail in Sullivan v. Murphy, *supra,* and it suffices here to quote an excerpt from that opinion:

The authorities were confronted on May 3 with the need to prevent any build-up of large numbers of persons at the focal points of the demonstration. There was a danger that the police ranks would themselves be overwhelmed. There was also the possibility that crowds of people would, by the mere fact of their presence, thwart efforts to keep the highways open.

The police responded to the situation by making mass arrests. In so doing, however, they swept up innocent persons along with the lawbreakers. The *Washington Star* quoted Assistant Police Chief Hughes as saying: "We had them . . . and we had to do something right away. Someone can judge the rightness of it later." This is, of course, not evidence as such, but it vividly summarizes the situation fairly apprehended from the record.

. . . . . .

The pivotal moment was 6:23 a. m., when Police Chief Jerry Wilson issued an order suspending normal field arrest procedures. According to Chief Wilson's sworn testimony in another action, incorporated into the record of this case, his decision was motivated by reports that demonstrators were in the process of damaging automobiles and blocking traffic at a number of locations. He also testified as to his apprehension of "serious property damage or death or serious injury to innocent persons if the city were closed or if the demonstrators should decide to do something more than simply block traffic, as, for example, loot or engage in acts of thrashing or arson," and his conclusion that "it is not practical for the police to rapidly arrest hundreds of individuals who are

blocking traffic and process them through the field arrest process."

This suspension remained in effect throughout the day, and for the vast majority of the nearly eight thousand persons taken into custody neither field arrest forms nor Polaroid photographs were prepared at the time of apprehension. Instead, the arrestees were simply loaded aboard vehicles and taken to various detention areas that had been established, principally Robert F. Kennedy Stadium and the District of Columbia Jail. Arresting officers did not accompany their prisoners. Indeed, in many instances, the arrestee had no way of even becoming aware of the identity of the officer making the arrest, because many policemen wore neither badges nor name tags.

. . . . . .

In the absence of field arrest forms, the authorities lacked any information concerning the thousands of persons who were being held in police custody. There was no record of time, location or circumstances of the arrests. Manifestly, the District of Columbia was at this time utterly incapable of preparing cases against the arrestees. If the prisoners had been arraigned, the Superior Court would plainly have been compelled to order their release for failure to show probable cause for arrest. In a post hoc effort to remedy this situation, special booking procedures were established to gather and record information concerning the persons arrested and to photograph, fingerprint and formally charge them.

It appears that many of the persons held at the District of Columbia Jail were either processed there or transferred to local police precincts for booking. Those who had been detained at RFK Stadium—together with some prisoners being held at the Jail and at other locations—were sent to a makeshift booking center that had been established at the District of Columbia Coliseum, located close by the Stadium. This processing facility was staffed in large part by volunteer attorneys from various divisions of the Justice Department, acting under the supervision of Metropolitan Police officers. Their testimony, given under subpoena, is incorporated in the record.

Prisoners were taken from the detention areas to a table where "long form" arrest records (identified as Police Department Form number 255) were prepared. The Department of Justice employees who assisted in the bookings were told to record the name, address and physical description of each arrestee. In the blank marked "Original Charge" they were instructed to enter the words "Disorderly Conduct." At their initial briefing, they had been given a list containing the names, badge numbers and unit designations of seven police officers. Under the caption "Name of Arresting Officers," they were told to insert "one name taken seriatim from [this] list of seven;" and they were specifically told to leave blank that portion of the form in which the circumstances of the arrest were to be recorded.

Once the "long forms" had been completed, prisoners were escorted to a second table where field arrest forms and blank FBI fingerprint cards were filled out. Those working as clerks in this section had also been given the list of seven police officers' names to record under the heading "Arresting Officer". For the most part, however, they merely copied whatever name had been entered on the previously completed "long forms."

When these steps had been accomplished, the prisoners were taken to an area where they were fingerprinted and photographed. Any who refused to submit to this procedure were returned to detention, in the locations that had come to be dubbed "detention pens."

Arrestees who had undergone processing were given an opportunity to secure their release by posting collat-

eral bond at the detention center. Even such acquiescence was no guarantee of prompt release, as appears from the affidavits of one person held for 15½ hours at RFK Stadium and the Coliseum, another for "about 20 hours" at the same locations, and a third for 17 hours at the D.C. Jail and the 14th Precinct lock-up.

Sullivan v. Murphy, *supra,* 156 U.S. App.D.C. at 39–41, 478 F.2d at 949–951 [footnotes omitted].

### B. *Background of These Appeals.*

The plaintiffs began these lawsuits on May 12, 1971. Thereafter, they sought extensive discovery aimed at ascertaining the extent to which law enforcement activities during the demonstrations had been directed and/or supervised by the Chief of Police and higher officials at the Department of Justice. In a deposition taken by the plaintiffs, Chief of Police Wilson testified about his communications with Justice Department officials prior to and during the May Day demonstrations. These included several meetings at the Justice Department, held before the demonstrations, at which anticipated law enforcement problems were discussed; consultations with the Department during the demonstrations by a means of a direct telephone line to the Chief's police cruiser; and conversations with a Department official sometimes accompanying the Chief on the scene. The Justice Department defendants acknowledged these communications, but denied any involvement in decisions regarding the methods to be used by law enforcement personnel in the arrest and confinement of particular persons.[4]

The plaintiffs served the defendants Mitchell and Kleindienst with interrogatories calling for disclosure of the following information: the date and place of each predemonstration meeting, the participants, the medium of communication, and "what was said by each person in as much detail as you can recall or determine from your records." The defendants filed partial answers to the interrogatories, but they declined to answer insofar as disclosure of irrelevant material or of "considerations, deliberations, or advisory opinions" was demanded. Plaintiffs moved for an order compelling discovery, and the District Court ordered the defendants Mitchell and Kleindienst to submit further answers to be inspected by the court *in camera.* The Court, in an order filed December 18, 1972, ruled that the material submitted for *in camera* examination was privileged. Thereafter, the Justice Department defendants renewed a motion for summary judgment, on the ground of official immunity from liability arising from the acts alleged in the complaint. In a brief order filed March 26, 1973, the District Court granted summary judgment in favor of Justice Department defendants, stating that "the actions of these defendants were well within the 'outer perimeter' of defendants' official duties, Barr v. Matteo, 360 U.S. 564 [79 S.Ct. 1335, 3 L.Ed.2d 1434] (1959)."

While the motion of the Justice Department defendants for summary judgment was pending, the Supreme Court decided District of Columbia v. Carter, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973), holding that the District of Columbia is not a "State or Territory" within the meaning of 42 U.S.C. § 1983. Since the plaintiffs' complaint in the case at bar had relied in part upon § 1983, the Department of Justice, on February 13, 1973, advised the District Court of the decision, concluding its

---

4. In affidavits accompanying a motion for summary judgment, defendants Mitchell and Kleindienst stated that at pre-demonstration meetings at the Justice Department "the desirability of arresting demonstrators who violate the law" had been discussed, but they denied participation in any discussions concerning "the manner and methods for the utilization of police forces or the tactics to be used by the police" in the apprehending of demonstrators, and they denied that there had been any understanding or agreement as to post-arrest procedures.

memorandum with the statement that "we take no position on whether the Court should certify this action, insofar as it involves the District of Columbia defendants, to the Superior Court." On February 20, the District Court, apparently *sua sponte*, certified to the Superior Court the plaintiffs' claims against the District defendants.

## II. DISMISSAL OF THE CLAIMS AGAINST THE JUSTICE DEPARTMENT DEFENDANTS ON THE GROUND OF OFFICIAL IMMUNITY

### A. *Issue Presented for Review.*

The narrowness of the immunity question presented by this appeal is perhaps best conveyed by our noting issues that are not now before us. We are not at this juncture concerned with whether the plaintiffs were, as they allege, seized while engaging in entirely lawful activity, nor whether the Justice Department defendants participated in or directed the law enforcement activities that resulted in the plaintiffs' detention. Nor are we presented with the question whether the seizure and detention to which plaintiffs were subjected, even if shown to have been without probable cause, might be deemed a justifiable suspenison of constitutional rights in the face of an extraordinary emergency.[5] The Justice Department defendants did not seek summary judgment on such a theory but instead asserted immunity. The issue presented here is this: do high officials of the Justice Department enjoy absolute immunity from liability for directing or participating in law enforcement activity that deprives innocent citizens of Fourth and Fifth Amendment rights?

### B. *General Doctrine of Official Immunity*

The principle that certain government officers should not be held liable for every injury that flows from official conduct is rooted in the premise that public officials who exercise discretion will be unreasonably deterred from vigorous adminstration if fearful that their judgment will later be questioned as a result of vindictive litigation. The undesirability of chilling legitimate official conduct by imposing liability has been repeatedly reaffirmed, but the principle has become increasingly difficult to apply as courts have perceived both that a wide variety of officials must make decisions when an unambiguously "correct" choice is not entirely clear in advance, and that the breadth of an official's discretion does not detract from his capacity to inflict injury.

The immunity of judges has long been settled. The judge is not liable for any injuries resulting from acts within his jurisdiction, and jurisdiction is construed broadly so that a judge will not be held liable unless he acts without color of authority. *See* Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 20 L.Ed. 646 (1872). The common law immunity of judges is fully applicable in suits under 42 U.S.C. § 1983 alleging deprivations of constitutional rights. Pierson v. Ray, 386 U.S. 547, 553–555, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967).

Executive officials also enjoy immunity from liability for a variety of injuries arising from official acts. Kendall

---

5. As in Sullivan v. Murphy, *supra*, such a defense has not been interposed. We adverted to the issue there but found resolution unnecessary, holding that even if arrest and detention of the innocent were justified, "no legitimate overriding interest of public safety" had been served by their later booking and prosecution. 156 U.S.App.D.C. at 49, 478 F.2d at 959. That holding, of course, is controlling in the present case if the plaintiffs ultimately establish the absence of probable cause. Such intricate questions as the proper measure of damages stemming from fingerprinting, photographing, and booking, where prosecution is later dropped and the records expunged, do not detain us here. Our identification of the possibility of an "emergency" defense should not be taken as an expression that it could be successfully asserted. The defendants have not raised it, and should they do so, resolution would have to await a record more complete than that made by the affidavits now before the court.

v. Stokes, 44 U.S. (3 How.) 87, 11 L.Ed. 506 (1845), held that the Postmaster General was not liable in damages for having suspended payment on a contract made by his predecessor in order to examine the propriety of payment. Though the money was later determined to be owing, the Court stated that the officer "had a right to suspend [payment] until he made his examination and formed his judgment." 44 U.S. at 98.

In Spalding v. Vilas, 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780 (1896), the Supreme Court held that the Postmaster General and several subordinates could not be held liable in damages as a result of publishing "official communications made by him pursuant to an act of Congress," 161 U.S. at 498, 16 S.Ct. at 637, where it was alleged that the officer had acted maliciously, with the intention of injuring the plaintiff's contractual relations. The principle that an executive official is shielded while making official communications was extended further in Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), a defamation action brought against the Acting Director of the Office of Rent Stabilization, in which the Supreme Court held that the official enjoyed an absolute privilege while making a public statement so long as his action was "within the outer perimeter of [the official's] line of duty," 360 U.S. at 575, 79 S.Ct. at 1341. The decisions in Spalding v. Vilas, *supra,* and Barr v. Matteo, *supra,* focused on the particular injuries alleged there—loss of contract in *Spalding* and injury to reputation in *Barr.* While it is possible to draw upon these opinions for an immunity that protects officials under different circumstances, *see* Norton v. McShane, 332 F.2d 855 (5th Cir. 1964), cert. denied, 380 U.S. 981, 85 S.Ct. 1345, 14 L.Ed.2d 274 (1965), the soundness of any such exten-

sion of an absolute immunity must be reappraised in the light of Scheuer v. Rhodes, *supra,* discussed below.

■ For prosecuting attorneys an immunity rule has been complicated by the diversity of their functions, with some, such as the presentation of evidence to a grand jury and the conduct of a trial, closely entwined with the judicial process, and others, such as the direction of investigative or law enforcement activity, futher removed from judicial scrutiny. Prosecutors have been held to enjoy absolute immunity in connection with those functions in which they participate in the judicial process. *See, e. g.,* Yaselli v. Goff, 12 F.2d 396 (2d Cir. 1926), aff'd per curiam, 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1927).[6] However, the same protection has not been available when a claim under civil rights legislation focuses on a prosecutor's actions in the course of directing police investigative activity. *See* Robichaud v. Ronan, 351 F.2d 533 (9th Cir. 1965); Lewis v. Brautigam, 227 F.2d 124 (5th Cir. 1955).

■ The doctrine of immunity as applied to executive officers is put in perspective with the Supreme Court's recent decision in Scheuer v. Rhodes, *supra.* In that case, the plaintiffs alleged violations of constitutional rights at the hands of law enforcement forces deployed at the campus of Kent State University in May, 1970. Their suit for damages, brought under 42 U.S.C. § 1983 against the Governor of Ohio, the Adjutant-General and various other members of the Ohio National Guard, and the president of Kent State University, had been dismissed on the ground that the officials involved enjoyed absolute immunity. The Supreme Court held that the officials' protection was narrower. The Court recognized the need for public officials faced with threatened civil disorder to respond swiftly

---

6. *See also* Kauffman v. Moss, 420 F.2d 1270 (3d Cir. 1970), cert. denied, 400 U.S. 846, 91 S.Ct. 93, 27 L.Ed.2d 84 (1970); Ney v. California, 439 F.2d 1285, 1287 (9th Cir. 1971); Arensman v. Brown, 430 F.2d 190,

193 (7th Cir. 1970); Madison v. Gerstein, 440 F.2d 338 (5th Cir. 1971). *But see* Hilliard v. Williams, 465 F.2d 1212 (6th Cir. 1972), cert. denied, 409 U.S. 1029, 93 S.Ct. 461, 34 L.Ed.2d 322 (1972).

and firmly. It observed: "Decisions in such situations are more likely than not to arise in an atmosphere of confusion, ambiguity, and swiftly moving events and when, by the very existence of some degree of civil disorder, there is often no consensus as to the appropriate remedy." 416 U.S. at 246–247, 94 S.Ct. at 1691. But the Court held that the need for "decisions and action to enforce the laws for the protection of the public" could be accommodated with the plaintiffs' interest in redressing violations of their constitutional rights by affording the official a qualified immunity, shielding action taken in good faith belief as to its constitutionality, a belief justified by the circumstances reasonably known to the official at the time he acts. Although the *Scheuer* opinion couples good faith belief with "reasonable grounds" for the belief, hence the official's assertion of good faith is not conclusive, it simultaneously cautions that courts will not unfairly use hindsight in assessing official actions challenged in litigation. An officer is "entitled to rely on traditional sources" for the information on which he forms a belief as to the lawfulness of his act. 416 U.S. at 246, 94 S.Ct. at 1691. The official is protected if he entertains a reasonable belief that his actions are lawful, notwithstanding a subsequent judicial determination that his actions have infringed constitutional rights. *See* Pierson v. Ray, 386 U.S. 547, 555–557, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). The Supreme Court in *Scheuer* concluded that

> These considerations suggest that, in varying scope, a qualified immunity is available to officers of the executive branch of Government, the variation dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good faith belief, that affords basis for qualified immunity of executive officers for acts performed in the course of official conduct.

416 U.S. at 247–248, 94 S.Ct. at 1692.

C. *Official Immunity in the Context of This Case.*

■■ Although the *Scheuer* decision is not dispositive of the case at bar, the reasoning of that opinion, considered in the context of the present case, mandates rejection of the District Court's implicit conclusion that the Justice Department defendants are shielded by an absolute immunity while performing official functions.[7] We hold that a qualified immunity, having the same general character as that contemplated by the Supreme Court in *Scheuer*, is available to the Justice Department defendants in the present action. Such an immunity appropriately allows vindication of the

---

7. In its brief order granting summary judgment in favor of the Justice Department defendants, the District Court stated that the "actions of these defendants were well within the 'outer perimeter' of defendants' official duties." This finding, and the citation of Barr v. Matteo, *supra,* must be taken as indicating a view that the absolute privilege applied in Barr v. Matteo to defamation actions extends to shield officials from liability arising from any official act.

Appellants challenge the District Court's finding that the Justice Department defendants acted within the scope of their authority, asserting that the finding is inconsistent with representations by defendants Mitchell and Kleindienst, made in their affidavits, that their duties in connection with civil disturbances are to advise the President as 'to the possible use of Federal troops. Appellants assert that these duties cannot reasonably extend to consultation with local police regarding tactics to be used in dealing with a disturbance that does not result in a Presidential declaration of emergency or martial law. We believe that the duties of Justice Department officials embrace consultations with the District of Columbia police as to methods used to deal with disturbances that contemplated disruption of operation of the Federal government.

Fourth and Fifth Amendment rights at stake, while preserving for the officials involved a shield against liability that will allow vigorous, legitimate use of power.

██ The individual rights at stake here are of the same magnitude as those asserted in *Scheuer*. Freedom from arbitrary arrest and detention are among our most cherished liberties.[8] Their infringement has warranted a remedy in damages inferred from the Constitution itself in cases where Congress has failed to provide it by statute. Bivens v. Six Unknown Named Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The infringement alleged here is substantial, carrying overtones of physical abuse. Elements of the assault upon individual liberty remain unredressed even if reverberation of harm into the future is contained by such relief as the expungement of arrest records. *See* Menard v. Saxbe, 162 U.S.App.D.C. 284, 498 F.2d 1017 (1974); Sullivan v. Murphy, *supra*.

██ The defendants here, unlike the state officials in *Scheuer*, are the highest officers of a Federal executive department. The difference in office is relevant, for immunity depends in part upon "scope of discretion and responsibilities of the office," Scheuer v. Rhodes, *supra*, 416 U.S. at 247, 94 S.Ct. at 1692. But the difference is not conclusive in this case. Like the highest executive officer of a state, the head of a Federal executive department has broad discretionary authority. Each is called upon to act under circumstances where judgments are tentative and an unambiguously optimal course of action can be ascertained only in retrospect. Both officials have functions and responsibilities concerned with maintaining the public order; these may impel both officials to make decisions "in an atmosphere of confusion, ambiguity, and swiftly moving events." Scheuer v. Rhodes, *supra*, 416 U.S. at 247, 94 S.Ct. at 1691. Having a wider territorial responsibility than the head of a state government, a Federal cabinet officer may be entitled to consult fewer sources and expend less effort inquiring into the circumstances of a localized problem. But these considerations go to the showing an officer vested with a qualified immunity must make in support of "good faith belief;" they do not make the qualified immunity itself inappropriate. The head of an executive department, no less than the chief executive of a state, is adequately protected by a qualified immunity.

In arguing for absolute immunity, the defendants stress the particular duties of the Attorney General, especially his broad supervisory responsibilities over much of the Federal criminal justice system. The Attorney General is on occasion referred to as the nation's "chief prosecutor" as a kind of journalistic shorthand. However, the absolute immunity often accorded prosecuting attorneys cannot shield the defendants in this case, for the prosecutor's absolute protection, like that of the judge from which it is derived,[9] is both justified and bounded by the judicial traditions and procedures that limit and contain the danger of abuse.[10] Cases holding

---

8. "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." Terry v. Ohio, 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968) *quoting* Union Pacific R. Co. v. Botsford, 141 U.S. 250, 251, 11 S.Ct. 1000, 35 L.Ed. 734 (1891).

9. *See* Pierson v. Ray, *supra*, 386 U.S. at 554, 87 S.Ct. at 1218:

[A judge's] errors may be corrected on appeal, but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice or corruption. Imposing such a burden on judges would contribute not to principled and fearless decision-making but to intimidation. *See also* L. Jaffe, Judicial Control of Administrative Action 242 (1965).

10. While some of the expressions in Norton v. McShane, 332 F.2d 855 (5th Cir. 1964), cert. denied, 380 U.S. 981, 85 S.Ct. 1345, 14

prosecutors absolutely immune have referred to them as "quasi-judicial officers," and the circumstances typically provide alternative instruments of the judicial branch to check misconduct—the discretion of the grand jury, the procedures of a trial, and the potential sanction of discipline imposed by the court itself.

■ There is also room for extension of the "judicial" immunity approach to the case of executive officials taking action on findings made following administrative adjudication and subjected to appropriate judicial scrutiny.[11] But such an extension of judicial immunity would not encompass the executive action complained of here—the making of decisions establishing policy as to clearing streets, making arrests, and confining those detained—for no comparable safeguards accompany them. *Compare* Robichaud v. Ronan, *supra*; Lewis v. Brautigam, *supra*. Continuing judicial surveillance of executive activity of this kind is inappropriate, *see* Gilligan v. Morgan, 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed. 2d 407 (1973), and courts have recognized the need for executive officials to be free under a variety of circumstances from procedural constraints modeled on the judicial process. This does not undercut, but rather underscores, the need for the sole judicial protection available, the damage action against the official violating constitutional rights.

D. *Disposition.*

■ In our disposition as to the Justice Department defendants, we follow the Supreme Court in *Scheuer* and remand for further proceedings. A determination whether the defendants' qualified immunity shields the acts at issue in this case requires a more complete record. An assertion of a qualified immunity would have to be accompanied by further factual presentation, concerning such matters as what the defendants knew about the nature of the demonstrations and the potential for disruption, what general arrangements were made between the defendants and those in direct command of the law enforcement personnel on the streets, and what the defendants knew about the actual conduct of the peace-keeping forces deployed during the demonstrations. The Justice Department defendants did not develop these matters in the District Court, but, consistent with their assertion of an absolute immunity, focused their presentation on showing that the defendants were acting in an official capacity, and resisted the plaintiffs' efforts at further discovery.[12] Summary judgment is a device available to contain harassment of public officials by forcing them to defend non-meritorious suits,

L.Ed.2d 274 (1965), rejecting an action against Justice Department officials even for allegedly "malicious" acts must be reassessed in the light of Scheuer v. Rhodes, the precise holding in that case established absolute immunity in connection with the officials' "selection of a proper method of enforcing a court's orders in the face of active opposition and obstruction" (p. 862), functions closely linked with the judicial process.

11. *Compare* Gregoire v. Biddle, 177 F.2d 579 (2d Cir. 1949), cert. denied, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950).

12. In response to the plaintiffs' motion to compel discovery, the District Court ordered the defendants to submit materials for *in camera* inspection, and subsequently the court denied discovery on the ground of executive privileges. The court's view that the defendants were shielded by absolute immunity may well have influenced its judgment as to the relevance of the material and the plaintiffs' need for it, elements of the balancing test that determines whether the privilege must yield. *See* Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena, 40 F.R.D. 318 (D.D.C.1966), aff'd on opinion below, 128 U.S.App.D.C. 10, 384 F.2d 979, cert. denied, 389 U.S. 952, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967) ; Nixon v. Sirica, 159 U.S.App.D.C. 58, 71, 487 F.2d 700, 713 n. 60 (1973).

While the appellate court has access to documents put under seal by the trial judge, the general rule is that it is the function of the trial judge to conduct the initial screening in the light of appropriate legal standards, with appropriate provision for indexing, or other identification of documents, and argument of counsel, all as developed by the *en banc* court in Nixon v. Sirica, *supra*.

but where the controversy turns on officials' knowledge and good faith belief—matters on which much of the relevant evidence will be possessed exclusively by officials themselves—the challenging party must be given the opportunity to show genuine dispute as to facts that are material under the appropriate legal principle.[13]

### III. CERTIFICATION OF THE LAWSUIT AGAINST THE DISTRICT OF COLUMBIA DEFENDANTS

Before granting summary judgment in favor of the Justice Department defendants, the District Court certified the action against the District of Columbia defendants to the Superior Court for the District of Columbia. Authority for certification is contained in 11 D.C.Code § 922(b), which provides:

In a civil action begun in the United States District Court for the District of Columbia during the 30-month period beginning on the effective date of the District of Columbia Court Reorganization Act of 1970, the court may certify the action to the Superior Court if it appears to the satisfaction of the United States District Court at or subsequent to any pretrial hearing, but before the trial thereof, that—

(1) the action will not justify a judgment in excess of $50,000; and

(2) the action does not otherwise invoke the jurisdiction of the court.

 This provision, which implements the termination of the "local" jurisdiction of the United States District Court for the District of Columbia effected by the District of Columbia Court Reorganization Act of 1970, permits certification only if the District Court finds that the amount in controversy is not satisfied *and* that Federal jurisdiction is not "otherwise" invoked, *i. e.,* that jurisdiction is conferred solely by the provisions of Title 11, District of Columbia Code.

While the District Court did not make findings as to either jurisdiction or amount in controversy, plaintiffs assert that certification was improper because "federal question" jurisdiction, 28 U.S. C. § 1331(a), is invoked, and we focus our attention on that issue.

 The actions against the police officers and Chief of Police include common law tort claims as well as claims arising directly under the Constitution. The latter claims are within the jurisdiction conferred by 28 U.S.C. § 1331 (a) if the $10,000 amount in controversy is satisfied. In the complaint each plaintiff demands $50,000 in compensatory and $10,000 in punitive damages. While the allegations of the complaint are not conclusive the court must meet a stringent standard to support a finding that the amount in controversy is not satisfied. It must find "to a legal certainty that the claim is really for less than the jurisdictional amount.", St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 382, 289, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938).[14] The District of Columbia defendants do not dispute the amount in controversy. It appears that the allegation of jurisdictional amount is supported by a claim that is substantial enough, at least on its face, to satisfy the provisions of § 1331(a). *See* Sullivan v. Murphy, *supra,* 156 U.S.App.D.C. at 50, 478 F.2d at 960. *See also* Hartigh v. Latin, 158 U.S.App.D.C. 289, 485 F.2d 1068 (1973).

 The District defendants predicate their attack on federal jurisdiction

---

13. The Justice Department defendants assert that the record contains no evidence of their participation in or direction of the law enforcement activities of which plaintiffs complain. But these defendants did not seek summary judgment below on such a theory, and that is the appropriate vehicle for raising such a contention initially. Should the defendants again move for summary judgment, plaintiffs will have an opportunity to proceed under Rule 56, including motion for discovery, to establish a genuine issue as to a material fact.

14. Occasionally, failure to satisfy the jurisdictional amount may be found despite an allegation of $10,000, *see* James v. Lusby, 162 U.S.App.D.C. 352, 499 F.2d 488 (1974).

on a theory that § 1331(a) does not extend to suits against officials of the District of Columbia "acting in a purely local capacity." (D.C. Brief 12). Such a construction finds no support either in the words or the legislative history of § 1331(a) and is inconsistent with our prior decisions in Sullivan v. Murphy, *supra*, and Hartigh v. Latin, *supra*. The Supreme Court gave no hint of such an exception to § 1331 when it recently concluded that a claim against a District of Columbia police officer could not be maintained under 42 U.S.C. § 1983 but could be litigated in the federal courts of the District of Columbia under § 1331. *See* District of Columbia v. Carter, *supra,* 409 U.S. at 432–433, 93 S.Ct. 602.

The District of Columbia, citing the holding that a municipality is not a "person" liable under 42 U.S.C. § 1983,[15] argues that similarly a municipality may not be sued on a claim for damages arising directly under the Constitution. The District's contention raises the question whether *respondeat superior* liability is appropriate in an action for deprivation of constitutional rights, where the remedy is traced directly to the Constitution rather than to 42 U.S.C. § 1983. This is a question raised for the first time in this court, on which the parties, even on appeal, have not thoroughly focused. It applies only to the District of Columbia, and even if the District's position were sustained claims against the individual officers would remain standing. Even as to the District, the question goes not to the District Court's jurisdiction but to the merits, whether plaintiffs have stated a claim against the District of Columbia.[16] We decline to interject ourselves into the issue at this juncture. The defendants

may present it in the normal way, by a motion to dismiss filed in the District Court.[17]

Since the actions against the District of Columbia defendants arising directly under the Fourth and Fifth Amendments are within the District Court's jurisdiction conferred by § 1331(a), the District Court also has pendent jurisdiction over the common law claims stated against these defendants. *See* Carter v. Carlson, 144 U.S.App.D.C. 388, 447 F.2d 358 (1971), rev'd on other grounds, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973); Marusa v. District of Columbia, 157 U.S.App.D.C. 348, 484 F.2d 828 (1973). The District Court's power to resolve the pendent common law claims continues even if plaintiffs do not prevail on the constitutional claims. *See* Rosado v. Wyman, 397 U.S. 397, 403–405, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). *See also* Hagans v. Lavine, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974).

The judgment is reversed and the case remanded for further proceedings not inconsistent with this opinion.

So ordered.

MacKINNON, Circuit Judge (concurring):

I concur in the result. However, from a close examination of the record it appears highly likely that subsequent disclosures will prove the federal officers acted within the scope of their proper duties. I say highly likely in view of the opinion we express that:

> We believe that the duties of Justice Department officials embrace consultations with the District of Columbia police as to methods used to deal with disturbances that contemplated dis-

---

15. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

16. Failure to state a claim does not deprive the District Court of jurisdiction under 28 U.S.C. § 1331(a). Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946).

17. The District also contends that the suit as to Chief Wilson should be dismissed because the record clearly refutes any allegation of his participation in the events complained of. This contention, also raised on appeal for the first time, is a matter that goes to the merits, appropriately raised in the District Court.

ruption of operation of the Federal government.

At 92 n. 7.

My concurrence should not be interpreted as agreement with any inference that may be present in this case or in Sullivan v. Murphy, 156 U.S.App.D.C. 28, 478 F.2d 938, cert. denied, 414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (1973), that the original arrests were unlawful because the police in most cases after 6:23 A.M. on May 3d were required to dispense with the field arrest forms in order to deal with the ensuing riot that was attempting to "close down the government." Nor do I agree that the submission of the police to the compulsions of dealing with riot and conspiracy to disrupt the federal government shifts the normal burden of proof to them. The police did an admirable job in handling a mob of unprecedented proportions (150,000 people), many of whom were seeking to carry out an unlawful objective by unlawful means, and the results were accomplished without a declaration of martial law, without the intervention of the National Guard or Army troops, and with minimum physical injury to individuals. In so doing, because of their limited manpower, the police were not able to perform all the paper work they usually carry out in making arrests. Thus, many persons who were undoubtedly guilty escaped conviction because the identity of those who could prove their guilt was never recorded. This was a necessary consequence of the unusual circumstances which confronted the police. Nothing I have said, however, condones charging the arrestees in an improper manner after their arrest.

WILKEY, Circuit Judge (concurring):

I concur in Judge Leventhal's opinion for the court. And, viewing the issue before us as carefully defined in Part II.A. of the opinion, I find nothing in the court's opinion inconsistent with the observations of Judge MacKinnon, and therefore join in his expression of views.