**Charles E. SHIPP, Plaintiff,**

v.

**Eugene L. WALLER and Joseph F. Dual, Sr., Defendants.**

**Civ. A. No. 74–780.**

United States District Court,
District of Columbia.

Jan. 6, 1975.

Roy J. Bucholtz, Washington, D. C., for plaintiff.

Derek Meier, Asst. U. S. Atty., Washington, D. C., for defendants.

## MEMORANDUM–ORDER

GASCH, District Judge.

This matter came before the Court on the motion of both defendants to dismiss this action or, in the alternative, for summary judgment. Since the motion filed relies on affidavits and other materials going beyond the pleadings in the case, the Court will treat it as a motion for summary judgment.

### I. *Undisputed Facts.*

The facts giving rise to this case are completely undisputed. Plaintiff Shipp was an employee of the General Services Administration (GSA). Both defendants, Messrs. Waller and Dual, were also employees of the GSA and had worked with or over Mr. Shipp. All three of the parties are black males.

Mr. Shipp, in January, 1973, filed an Equal Employment Opportunity (EEO) complaint in which he alleged that he was a victim of racial discrimination at his job. As a result of this complaint, an investigator, Mr. Frederick Meffle, was appointed by the Civil Service Commission to explore the circumstances of the alleged discrimination.[1] In the course of his investigation, Mr. Meffle interrogated Messrs. Waller and Dual. Each of these latter gentlemen, in response to the investigator's questions, furnished an affidavit. Each affidavit asserted essentially that Mr. Shipp had a drinking problem. Subsequently Messrs. Waller and Dual were called as witnesses at an administrative hearing on Mr. Shipp's EEO complaint.[2] In response to questions from Mr. Shipp's counsel, each defendant reasserted his view that Mr. Shipp had a problem with alcohol. The statements made by Messrs. Waller and Dual in their respective affidavits and at the hearing were allegedly defamatory and are the basis for this suit.

### II. *Legal Background.*

The Civil Service Commission requires all agencies to maintain an adequate EEO program, including a procedure for the processing of complaints.[3] Once a complaint is filed, an investigator must promptly be appointed to review thoroughly the circumstances under which the alleged discrimination occurred.[4] The agency director of EEO must furnish to the investigator a written authorization: 1) to investigate all aspects of the complaint; 2) to require all employees of the agency to cooperate with the investigator in the conduct of the investigation; and 3) to require all employees of the agency having any knowledge of the matter complained of to furnish testimony under oath or affirmation without a pledge of confidence.[5]

GSA has provided its own internal regulations regarding EEO matters.[6] Those rules parallel the Civil Service regulations. In regard to an investigator, GSA regulations require that the Civil Service Commission be requested to provide an investigator rather than having one appointed from within GSA.[7] The powers of an investigator so ap-

---

1. Mr. Meffle was an employee of the Civil Service Commission's Bureau of Personnel Investigations.

2. The hearing was before a complaints examiner who was designated by the Civil Service Commission. The testimony of defendants was under oath and subject to cross-examination.

3. 5 C.F.R. §§ 713.201–713.283.

4. 5 C.F.R. § 713.216(a).

5. 5 C.F.R. § 713.216(b).

6. GSA Handbook, ADM.P. 1090.7, Chap. 4 (Aug. 25, 1972).

7. *Id.* ¶6(a), (b).

pointed are the same as those provided for in 5 C.F.R. § 713.216(a), (b).

Defendants rely on Barr v. Matteo [8] to support their contention that their utterances were absolutely privileged. In Barr, the Supreme Court dealt with allegedly defamatory remarks made in a press release by the Acting Director of Rent Stabilization.[9] That official was not required by law or direction of his superiors to make the press release.[10] Issuance of press releases, however, was standard agency practice.[11] The Court found that the action taken was within the outer perimeter of the official's line of duty and thus was absolutely privileged.[12]

Plaintiff's contention is that Barr v. Matteo has been modified by Scheuer v. Rhodes [13] and he draws upon Apton v. Wilson [14] for support of his point. Plaintiff asserts that Scheuer and Apton stand for the proposition that any privilege in cases such as the present one is at best qualified rather than absolute. The Court disagrees.

The Scheuer case concerned a suit against the governor of Ohio and other state officials for actions taken during the Kent State incident. The district court had dismissed the complaints on the ground that they were barred, as a matter of law, by the Eleventh Amendment or, alternatively, by the absolute immunity of state officials for their actions.[15] The complaints in Scheuer had alleged that defendants, acting under color of state law, had deprived plaintiffs of their lives and rights without due process of law.[16] The claim of plaintiffs, then, rose to Constitutional stature, alleging a deprivation of Federal Constitutional rights by officials of a state acting under color of that state's law.

It was in this context that the Court determined that Federal courts had jurisdiction over the matter. The opinion of Chief Justice Burger makes clear that the Court was aware both of the peculiar facts of the case and of its procedural posture and that the ruling of the Court was uniquely based on those circumstances.[17] The case, then, modifies the doctrine of official privilege only insofar as the doctrine may apply to alleged deprivation of basic constitutional or civil rights and not as it may apply to situations such as in the case at bar.[18]

The Apton case similarly fails to aid plaintiff. There some 34 plaintiffs alleged that they were arrested while engaged entirely in lawful and unobjectionable conduct during the "May Day demonstrations" of May, 1971, in Wash-

---

8. 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959).

9. The release was alleged to be defamatory when coupled with the reported views of certain members of Congress. Id. at 568, 79 S.Ct. 1335.

10. Id. at 575, 79 S.Ct. 1335.

11. Id. at 574, 79 S.Ct. 1335.

12. Id. at 575, 79 S.Ct. 1335.

13. 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

14. 506 F.2d 83, (D.C.Cir., 1974).

15. 416 U.S. at 233–34, 94 S.Ct. 1683. The district court had found that it lacked jurisdiction. Id. at 235, 94 S.Ct. 1683.

16. Id.

17. Id. at 236, 238, 242, 249–50, 94 S.Ct. 1683. The Court was confronting a case in which dismissal was granted before answers were filed.

18. This conclusion is strengthened by the fact that the Court twice cited Barr v. Matteo without stating that it was overruling that case and without any indication, explicit or implicit, of disapproval. See id. at 242, 247, 94 S.Ct. 1683. Indeed, the Court used Barr as a substantial aid in its exposition of the law of executive privilege. Id. It was also clear that the Court regarded Barr as analogous to the situation before it in Scheuer rather than as directly in point. Thus, it first referred to Barr as being in a "somewhat parallel context" and later as being in "a context other than a § 1983 suit." Id. at 242, 247, 94 S.Ct. at 1692. To conclude from this that the Court intended to overrule Barr or to modify its scope within the area delineated by its facts (defamation) is unwarranted.

ington, D. C.[19] They sought damages for an alleged deprivation of Fourth and Fifth Amendment rights and also sought equitable relief.[20] Certain of the defendants were high officials of the United States Department of Justice.[21] The District Court granted summary judgment for these defendants on the ground of absolute executive immunity.[22] The lower court relied on Barr v. Matteo and stated that the actions of the defendant officials were well within the outer perimeter of their duties.[23]

The *Apton* Court explicitly noted that the question before it was whether high federal officials enjoy absolute immunity for actions, relating to law enforcement, that deprived innocent citizens of Fourth and Fifth Amendment rights.[24] Just as in *Scheuer*, then, *Apton* concerned the existence of immunity in the context of alleged deprivation of basic Federal Constitutional rights.[25] In such a context, the Court found no absolute immunity.

In so finding, however, the *Apton* Court said nothing that would indicate any thought that *Barr* had been modified in the area of defamation. The *Apton* opinion explored the basis for executive privilege and traced its development in the area of potential liability for allegedly defamatory communications, primarily through the cases of Spalding v. Vilas, 161 U.S. 483, 16 S.Ct. 631, 40 L. Ed. 780 (1896), and Barr v. Matteo. The Court specifically noted the "outer perimeter" language of *Barr*.[26] Then it stated:

> The decisions in Spalding v. Vilas, *supra*, and Barr v. Matteo, *supra*, focused on the particular injuries alleged there—loss of contract in Spald-

ing and injury to reputation in Barr. While it is possible to draw upon these opinions for an immunity that protects officials under different circumstances [citations omitted], the soundness of any such *extension* of an absolute immunity must be reappraised in the light of Scheuer v. Rhodes, *supra* . . . .[27]

The opinion in *Apton* shows clearly that to find absolute immunity in a case such as was before it would be unwarranted in light of *Scheuer*. This was so because such immunity would be an inappropriate extension of the principles laid down in *Barr*. It is clear, however, that the Court did not challenge the propriety of *Barr* within the area for which it was fashioned—defamation. Only the *extension* of *Barr* is to be viewed with suspicion. *Barr* is thus still good law in the area of defamation.

Accordingly, this Court cannot accept plaintiff's position that the privilege here in question is but a qualified one. That position, in the opinion of the Court, is based upon a misreading of *Scheuer* and *Apton*. Here we have no question of deprivation of basic constitutional rights as they exist in those two cases. Here we have only a damage action based upon alleged defamatory remarks. In this area of the law, *Barr* is controlling.

### III. Conclusion.

The task of the Court is therefore clear. It is to determine whether the actions of defendants herein may be said to be within the "outer perimeters" of their lines of duties. From the recital above, it can be seen that it was the positive duty of every GSA employee to co-

19. Apton v. Wilson, 506 F.2d 83, at 86 (D.C. Cir., 1974). The plaintiffs also claimed that, incident to their unlawful arrests, they were unlawfully detained, fingerprinted, photographed and booked, despite the absence of probable cause supporting any charge of illegal conduct. *Id.* at 86.

20. *Id.* at 86.

21. *Id.* at 86.

22. *Id.* at 86.

23. *Id.* at 89.

24. *Id.* at 90.

25. *See id.*, at 93, where the Court re-emphasizes the fact that Fourth and Fifth Amendment rights were at stake and notes that the "magnitude" of rights at issue before it was the same as those involved in *Scheuer*.

26. *Id.* at 91.

27. *Id.* at 91 (emphasis added).

operate fully with the investigator. Messrs. Waller and Dual, therefore, were required to respond fully and frankly to the queries of the investigator and to convey to him any knowledge they had regarding any of the circumstances bearing on the alleged discrimination. Anything less than such a full and frank disclosure would be a dereliction of a clear positive duty imposed upon all GSA employees.

Plaintiff's counsel contends that the statements made by Waller and Dual were irrelevant to the EEO complaint and that there was thus no duty to make them but rather a duty not to do so. The Court cannot agree. Mr. Shipp alleged that he had not received a promotion because of racial discrimination. An investigation into "all aspects" of the complaint must of necessity include inquiry into the circumstances surrounding Mr. Shipp's fitness for promotion. Information concerning a possible drinking problem is indeed relevant to such an inquiry.

The Court also is of the opinion that any investigation, and perhaps especially an EEO inquiry, must take place in an atmosphere of full and free disclosure if it is to fulfill its purpose. Such an atmosphere will not be encouraged by forcing a witness to choose between a risk of violation of regulations requiring full cooperation and a risk of personal liability incident to a defamation suit. To require a layman to discern for himself the vague border between appropriate disclosure and inappropriate defamation and to punish by the imposition of personal liability those who stray over that hazy line is to place too great a burden both on the EEO investigatory procedures themselves and on those likely to be caught up in them.

In short, the Court considers that defendants were duty bound to cooperate fully with the EEO investigation and to furnish all information which they had which was possibly relevant to that inquiry. The Court thinks that the information furnished was relevant. The Court is of the opinion that the state-

ments made by Waller and Dual to the investigator and at the hearing were well within the outer perimeters of their duties and were absolutely privileged.

Accordingly, it is by the Court this 6th day of January, 1975,

Ordered that the motion of defendants for summary judgment be, and the same hereby is, granted; and it is further

Ordered that judgment be entered herein against plaintiff and in favor of defendants in accord with the memorandum opinion of the Court.