UNITED STATES of America

v.

Ralph JOHNSON, Appellant.

No. 73–2221.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 14, 1975.

Decided Jan. 12, 1977.

Certiorari Denied June 20, 1977.
See 97 S.Ct. 2953.

On Rehearing *En Banc.*

Michael E. Geltner, Washington, D. C. (appointed by this court), for appellant. Monica Gallagher, Larry J. Ritchie, Washington, D. C., Phillipe Dumont * and Arthur Grushkow Sapper * were on the brief for appellant.

Stuart M. Gerson, Asst. U. S. Atty., Washington, D. C., for appellee. Earl J. Silbert, U. S. Atty., John A. Terry, James F. McMullin, Timothy J. Reardon, III and Barry L. Leibowitz, Asst. U. S. Attys., Washington, D. C., were on the brief for appellee.

* Entered an appearance as Student Counsel pursuant to Rule 20 of the General Rules of this court.

Before BAZELON, WRIGHT, McGOW-AN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB, and WILKEY, Circuit Judges sitting en banc.

Opinion for the court by Judge McGOW-AN, in which Judges WRIGHT, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB, and WILKEY join.

Separate concurring statement by Judge WRIGHT.

Separate concurring opinion by Judge LEVENTHAL, in which Judges WRIGHT and ROBINSON join.

Separate concurring opinion by Judge MacKINNON.

Dissenting opinion by Judge BAZELON.

McGOWAN, Circuit Judge:

 The central issue in this appeal of a conviction for possession of narcotics (33 D.C.Code § 402) is the propriety of the denial by the District Court, after evidentiary hearing, of a pretrial motion to suppress evidence. The police, confronted visibly with a major narcotics violation in progress, ultimately made a warrantless entry into the house where such violation was taking place, and the evidence in question was forthcoming in the course of the ensuing arrests and searches. The District Court, in ruling against the motion, avowedly took into account the fact that the police, initiating the procedures to obtain a warrant, received legal advice to proceed without one because, in the special circumstances here involved, the delay necessarily inherent in getting a warrant seriously jeopardized the public interest in effective law enforcement. On the record as made, we agree with the District Court that the Government met its burden of showing that the police conduct was reasonable within the meaning of the Fourth Amendment, and affirm the conviction.[1]

I

We look to the evidence adduced at the suppression hearing. On the first day of that hearing (October 19, 1973), the witness presented by the Government was Officer Simms, of the Metropolitan Police assigned to narcotics investigation, who testified to the following effect.

Not long after 1:00 A.M. on June 14, 1973, Simms was informed by Sergeant Andrews that the Department had just received a telephone call from a person who stated that a large quantity of narcotics was present in the basement of 2918 28th Street, N.W., and that it was visible through the lighted basement window on the right hand side of the front of the house.[2] Simms and his partner, Officer Betts of the Narcotics Squad, immediately set out to investigate this report. Not being familiar with the area, they had difficulty finding the house in question arriving there a few minutes after 2:00 A.M. They first circled the house by driving down an alley along one side of the house, observing a '72 or '73 Cadillac car parked in the drive-

---

1. Appellant's two additional claims of error are that the trial judge erred in (1) denying appellant's motion for judgment of acquittal and (2) admitting the testimony of the witness G'Schwend. The first of these points had two aspects: One was that the denial of appellant's motion was inconsistent with the grant by the court of judgments of acquittal in the case of two codefendants, and the other was that the evidence was insufficient to support the jury conviction of possession. We find no abuse of the court's discretion in denying the motion for either of these reasons. As to the second point, we see no warrant for reversal in the ruling made. The testimony of G'Schwend, although perhaps of no great weight, was competent as well as relevant.

2. Although the call was anonymous, the caller's identity became known the next day, and he was a witness at the trial. He was one John Fudge, who testified that he had leased the house in question, signing the lease in the name of his uncle, Robert Tynes, with the latter's permission. The residence was intended for the use of one Livingston, one of appellant's codefendants, who provided the money for the rent. Fudge proposed to live there eventually, maintained clothing in the basement bedroom closet, and often used the bed in that room during the day. On the night he called the police, Fudge was on his way into the house to change his clothes when he saw the narcotics through the basement window.

way at the rear of the house. Completing this reconnaissance, they parked parallel in the street in front of the house, and went up the walkway to the door.

As they did so, Simms observed that, although the rest of the house was dark, there was a light in the right front basement window as reported in the telephone call. With a purpose either to confirm or negate that report, he stepped off the walk to his right—a distance which was later finally established by questioning of the court to be from two to three feet—and looked through the window for not more than 10 seconds. What he saw was the basement bedroom with three men sitting at a table. On the table was a "cutting mirror" and other narcotics paraphernalia used in preparing narcotics for distribution. On the mirror was a pyramid of white powder eight to ten inches high. Simms immediately realized that he was seeing the packaging for sale of a major amount of narcotics (later valued at trial as worth at least $85,000).

Facing what he believed to be a dangerous situation because of the high stakes and the number of persons seen through the window, Simms concluded that it was not practicable to force entry at that time. He and Betts withdrew to their unmarked cruiser where they endeavored to reach their superior officer, Yates, by radio call to the car in which Yates was on duty. This effort was not successful for technical reasons, and they thought it risky, in terms of alerting the inmates of the house to destroy the narcotics, to summon a regular marked cruiser with uniformed police. They immediately proceeded to Headquarters where Simms was able to reach Yates by telephone. It was agreed that Simms and Betts would meet Yates and his partner, Ponzelli, at a rendezvous point (Connecticut and Wyoming Avenues) before returning to the 28th Street house.

While at Headquarters Simms raised the question of getting a search warrant with his superior officers. Lieutenant Ford told him that he (Ford) would call an Assistant United States Attorney while Simms was enroute to the rendezvous point, and that further instructions would be relayed by radio to that point. Ford called Assistant United States Attorney Barcella and apprised him of the situation. Barcella responded that, based on his extensive experience in getting nighttime warrants, it would take a minimum of 1½ to 2 hours to get a warrant, during which time the powder seen by Simms would in all likelihood be removed. Thus Barcella advised Ford that entry should be made immediately without a warrant. He added the suggestion that, if there was likely to be a delay from the first observation to entry of one hour or more, it might be a good idea to look in the basement window again before going in.

Ford sent this information by radio to the rendezvous point and apparently also ordered another cruiser to join the group for greater safety. Thus it was that five officers in all returned to 28th Street. It was Simms' unshaken testimony that not more than 30 to 40 minutes at most had elapsed from the time he looked in the window until he was back at the house with instructions to enter. The cars were left some distance away, and each of the doorways to the house was covered. Simms noted that the right basement window was still lighted, and that a light also appeared in one of the windows in the upper portion of the house. Betts was at the front door, and Simms and the others went to the kitchen door. Simms knocked first on the screen door and shouted "Police! Police!" When there was no response he gave two or three loud knocks on the door itself. When there was still no response to his repeated calls, he prepared to break the door in when Officer Ponzelli told him not to because there was someone inside looking out through the glass. When this person withdrew and the door was still not opened, it was broken in with a sledgehammer which had been picked up by Simms on his quick visit to Headquarters.

Upon entry one officer went through the first floor to let Officer Betts through the front door. Simms and two other officers immediately rushed down the stairs to the

basement. At the bottom of the steps they found three men whom Simms, his gun out, ordered to freeze while they were being handcuffed. Simms then stepped through an open door into the lighted bedroom off to his left (the room which he had first looked into through the window). There he found the cutting mirror, but with only powder traces on it, not the powder itself. On the mirror still were the blue and red package tapes, and also on the table were the measuring spoons and pans, and the wrapping paraphernalia. On the floor by the table were distribution envelopes and strainers.

A fourth man was found hiding in a nearby basement closet. Officer Betts, in the basement by this time, found a fifth in the bedroom closet, and a sixth was found hiding in a clothes hamper by the basement stairwell. With the six prisoners secured, a search of the basement was made to try to find narcotics. While the narcotics paraphernalia visible in the bedroom were being collected, bundles of narcotics already labeled and packaged for distribution were found between the mattresses on the bed. In an old rug near the clothes hamper which appeared to have been hastily folded, there was a canvas bag containing a much larger number of bundles of narcotics.[3]

At the conclusion of Officer Simms's testimony and cross-examination, defense counsel unanimously signified that they did not wish to examine Lieutenant Ford and Mr. Barcella or any of the other police officers participating in the entry. Neither did they wish oral argument on their own motions. The prosecutor, however, expressed the thought that perhaps Mr. Barcella ought to be heard and that, in any event, he thought oral argument desirable. In deference to this last, the court set an adjourned date for oral argument, and asked the prosecutor to submit a statement for the record as to the policy in being at the time of the entry with respect to the availability of the federal magistrates on a 24-hour basis.

When the suppression hearing reconvened some two weeks later on November 1, the prosecutor asked, and was granted, leave to present Mr. Barcella as a witness. Mr. Barcella testified at some length about the procedures for getting nighttime warrants in effect on the date in question, and his experience in advising the police with respect to the need for warrants. Although the police could approach the magistrates directly, the better practice was for them first to have authority to do so from an Assistant United States Attorney; and, indeed, the magistrates would ordinarily, if called by a police officer directly, refer him back to the prosecutor's office for the handling of the matter.

The magistrate having the duty assignment on the night in question lived "quite a ways out in Maryland in Montgomery County," and it was necessary either to meet the magistrate at the McDonald's Restaurant at Eastern and New Hampshire Avenues within the District of Columbia or to go out to his house and bring him back to that point so that he could administer the oath within the District. It was Barcella's estimate, as stated by him to Ford, that to have done this on the night in question, including the prior preparation of the necessary papers, would have consumed "at least an hour and a half to two hours at the barest minimum." He had accordingly advised Ford that "if in the estimation of the officers the likelihood of the narcotics not being there after a couple of hours was fairly high, I didn't think they would have time to get a search warrant and they ought to enter the premises without one."

In addition to the transportation time involved, Barcella emphasized the substantial amount of time necessarily consumed by the details of getting together the information supporting the warrant and having it typed as an affidavit. He also described certain other forms that have to be prepared and ready for the meeting with the

3. Three packets of currency totalling $1000 were found beneath a stair carpet, beneath a couch upstairs, and behind an upstairs bedroom door. The basement closet also yielded up a gun.

magistrate.[4] In testifying generally as to his many personal experiences with nighttime warrants, Barcella said that the range of time required was never less than two hours, and on one occasion had taken 5½ hours.

The adjourned suppression hearing on November 1 concluded with oral argument and an oral ruling by the court in favor of the prosecution. On November 9, however, the defendants filed a motion to reopen the suppression hearing in order that they might present testimony by one or more of the federal magistrates assertedly relevant to the question of whether the police themselves bore the responsibility for the delays about which Barcella had testified. When the case was called for trial, the court noted as a preliminary matter that this motion was before him. The prosecutor opposed the motion on the ground that what was the defense proposed to show was the physical availability of the magistrates, and that the Government had never contended that the magistrates were not properly available; indeed, the Government was prepared to stipulate not only the fact of physical availability but also that, when the application papers in proper form are submitted to the magistrate, his action would be ordinarily taken within 30 minutes. What the Government had shown, so it was urged, was that the nature of the legal requirements with respect to the warrant applica-

tion process was such that substantial delay was inherent.

The court, in any event, permitted the defense to put Magistrate Burnett on the stand. He testified from his general experience that, from the time he receives a call from a policeman or an Assistant United States Attorney, "it takes two to three hours if the warrant application is sought at night." He added that there had been particular instances in which, when the papers were already prepared at the time of the call to him, the time had been as short as forty-five minutes.[5] The witness went on to say that the range of time required for nighttime warrants in his experience had been from 5 hours to the 45 minutes just referred to when the papers were in being before the call to him. He testified further that, for the past year or two, the police had had their papers in order when they presented them to him.

## II

Appellant, found hiding in the bedroom closet, was one of the six persons arrested in the 28th Street house.[6] Each was represented by counsel at the suppression hearing. Several weeks before the hearing, appellant filed a written motion to suppress "all narcotics drugs and paraphernalia" seized at the time of the arrest. The grounds asserted were that the arrests and

4. THE COURT: Just a second. This one and a half to two hour period you have delineated covers what now? What would be accomplished within that period?

THE WITNESS: Well, Your Honor, that would include the drafting of the affidavit in support of the search warrant itself, the writing or typing of the warrant, the words used, the general laying out of the circumstances necessary, the administerial and administration functions, such as filling out the front sheets of the warrant, the preprinted affidavit, and the preprinted search warrant forms with the correct address and correct title of violation that you are going under, other administrative functions, such as the Xeroxing enough copies so that the magistrate can keep one copy, you have enough copies so that one can be left on the premises, and you have enough copies so that an inventory can be returned the next day to the magistrate.

5. Q. That is when the paperwork is already prepared, forty-five minutes?

A. Already prepared for the warrant, including the affidavit, the administrative office record sheet or cover sheet for a search warrant, plus the search warrant, and one copy of the search warrant is already prepared, and the officers are ready to get in their car and start to my home.

6. By the time of trial on November 26, 1973, one (Harris) had become a fugitive. Of the remaining five, Yarbrough and Riggins were directed by the court to be acquitted at the close of the Government's case. Appellant and Nelson were found guilty of possessing heroin. The jury was hung as to Livingston, but he later pleaded guilty to the count in the indictment charging possession with intent to distribute. The fugitive, Harris, when apprehended in 1974, pleaded guilty to the simple possession count.

search "at approximately 3:00 A.M." on June 14, 1973 were "without probable cause, and without a warrant," and that there was "no reason for the failure of the police to have obtained a warrant." In appellant's supporting memorandum of points and authorities, four points were made:

1. There was a delay of more than 2½ hours from the initial telephone tip to the police and the warrantless entry into the house. "That some delay would be involved in seeking a warrant does not, without more, justify the warrantless arrests and searches here."

2. "Assuming arguendo that the police had probable cause to make a warrantless arrest when they observed three individuals, not the defendants, in the basement apparently cutting narcotics [see *Spinelli v. United States,* 393 U.S. 410 (89 S.Ct. 584, 21 L.Ed.2d 637) (1969); *Draper v. United States,* 358 U.S. 307 (79 S.Ct. 329, 3 L.Ed.2d 327) (1959)] there was no probable cause to believe that some 20–30 minutes later a felony was being committed or that the defendants were committing it. Thus any subsequent search cannot be justified as incident to a lawful arrest. *Coolidge v. New Hampshire,* 403 U.S. 443, 455 [91 S.Ct. 2022, 29 L.Ed.2d 564] (1971). There was, in any event, no lawful search within the meaning of (*Chimel v. United States,* 395 U.S. 752 [89 S.Ct. 2034, 23 L.Ed.2d 685] (1969)), given the location of the narcotics and the defendants at the time of the raid."

3. "At the time of the raid the narcotics were under a rug and under a mattress and hence were clearly not in plain view and subject to seizure . . . "

4. "The search was illegal because it was based on an illegal breaking and entry without notice of purpose and authority as required by 18 U.S.C. § 3109 . . . ." [7]

The written opposition filed by the Government to these motions recited, among other things, that "John L. Fudge, *lessee* of a private dwelling at 2918 28th Street, N.W., within which the six defendants in this case were arrested and a large cache of heroin seized, made a *then* anonymous phone call to police headquarters, reporting the large quantity of narcotics in the basement and stating that it could be seen through the basement window."

When the motions came on for hearing, defense counsel agreed that counsel for Nelson, Mr. Carl Fogel, could make the opening statement of the defense position for all of them. He did so, and his only reference to the window observation was that the anonymous caller "subsequently was unable to identify at least three of the parties as being in the house at that time." When he concluded his brief statement and the court asked if any other counsel wished to supplement it, appellant's counsel replied in the negative, and no other counsel responded.

In his direct examination Officer Simms described his observation through the window, saying that he had stepped off the walkway a few feet on to the grass to do so. On cross-examination, only counsel for Riggins and Yarbrough asked about the stepping off the walkway to look in the window, but brought out no more than Simms had already said. The court observed that there appeared to be no dispute that Simms had stepped briefly off the walkway on to the grass. Cross-examination by appellant's counsel was very brief and did not

7. A written motion and supporting memorandum identical in terms with appellant's was filed on behalf of Livingston and Nelson. The motions filed respectively on behalf of Riggins and Yarbrough each referred to the observation made by Officer Simms through the window, Simms having testified to this fact at the preliminary hearing when the arrestees first appeared before a magistrate and were bound over for the grand jury. Both Riggins and Yarbrough asserted in their papers that this observation was illegal as being a violation of defendants' privacy, although their principal claim was that there were no exigent circumstances justifying the warrantless entry. Riggins' motion concluded with the argument that "Any exigent circumstance that may have existed at the time the officer observed three men and white powder through the basement window, no longer existed thirty minutes later when they returned to the scene of their observation."

touch on Simms' peering through the window at all, except to ask how far it was from his point of observation to the powder on the table.

On redirect Simms testified that it was approximately 30 to 40 feet from the street to the basement window, and that he first saw the light as he went up the steps from the street sidewalk to the walkway to the house. The court asked the witness where the window was located with respect to the walkway, and the answer was that "The window is right off to the right of the walkway." The court then concluded from distance comparisons made from objects in the courtroom that "it (the window) looks to me to be about two or three feet out."

When the examination of Officer Simms was finished, and after defense counsel expressed no interest in having Officers Betts and Ponzelli placed on the stand for examination, there was the following colloquy between court and defense counsel:

THE COURT: I gather that at least from the thrust of the questions put to the witness that there isn't any serious question being raised with respect to the means of entry, that is, forcible entry?

MISS McINTYRE: No, Your Honor.

MR. CARL FOGEL: I think that is a fair statement.

THE COURT: And what counsel are presently concerned about is the lack of a warrant?

MR. CARL FOGEL: Yes sir.

When the suppression hearing resumed on November 1, the prosecutor observed, without dissent from any quarter, that "the last time we met, the issue was I thought drawn very distinctly as to Your Honor's concern and the focus of defense counsels' comments, and it went primarily to the reasonableness of the warrantless entry." It was on that assumption, unchallenged by the defense, that he pressed the court to hear testimony by Barcella.

When that testimony was completed, oral argument was had on the disposition to be made of the motions. Counsel for appellant addressed himself solely to the alternatives which he considered were available to Officer Simms at the time he looked in the window, assuming that "he at that point had sufficient corroboration of the type to reach the level of probable cause." The first alternative was that Simms could—and should—have forcibly entered the house then and there. Second, having chosen to leave the premises for a time, it was imprudent for him to have done so without first having arranged for enough additional police to have staked out each exit from the house. The third alternative was said to be just what Simms in fact did, and that was characterized as unreasonable because there was no assurance of the existence of exigent circumstances, or even of probable cause, when the police returned to the premises.[8]

In his oral ruling denying suppression at the close of the hearing on November 1—a ruling which the court saw no reason to alter at the reopened hearing to hear Magistrate Burnett—the court first observed that the facts as related by Officer Simms and Mr. Barcella were "not open to serious dispute." It considered to be reasonable

---

8. The arguments made on behalf of appellant's co-defendants generally made the same point, namely, that such probable cause or exigent circumstances as may have existed when Simms first looked through the window did not justify the warrantless entry when he returned. Counsel for Nelson, who was convicted along with appellant but did not appeal, and whose written motion made a reference to the asserted privacy invasion effected by the look through the window, made no reference to that question whatsoever. Neither did any of the other counsel, except the one representing Riggins whose written motion had also included the privacy point. But the oral argument for Riggins stressed an alleged illegality of the anonymous phone call *per se* rather than what was done in consequence of it; and it joined the others in placing major emphasis on the claim that Simms' departure from the premises dissipated his right to make a warrantless entry.

Given the nature of the defense arguments, the prosecutor confined himself to emphasizing the reasonableness of the warrantless entry in the light of Barcella testimony as to the delay inevitable in getting nighttime warrants, the short time that Simms was away, and the continuing existence of exigent circumstances when he returned.

Officer Simms' conclusion that it was too dangerous to attempt entry during his first appearance on the scene, and it found that Simms' attempt at that time to consult his superior by radio failed for technical reasons. The court found that 30 to 40 minutes at most elapsed before Simms was back on the scene, and it noted that the evidence of record showed only that the getting of a warrant would have meant a delay of 1½ to 2 hours. It regarded the failure of the police to look through the basement window again when they returned as of slight importance since they were back in such a short period of time. Finally, the court viewed the fact that the police had sought, and received, legal advice as contributing substantially to the reasonableness of the police action in making the warrantless entry.

### III

It is clear from the foregoing that, for all practical purposes, the case for suppression was presented in the District Court on the theory that the justification for an immediate warrantless entry to arrest and search was attenuated by the absence of the police for some 30 to 40 minutes. That was the issue argued to the court after the evidence was in, and that was the contention it disallowed in denying suppression. It was the same point made by newly-appointed appellate counsel to the division of this court which initially heard this appeal. It was the majority of that division which first canvassed in its opinion the propriety of Officer Simms' observation through the window. And, although that majority volunteered the view that that observation was improper and could be taken as nullifying all that came later, it concluded not to rest its decision on that ground because it had not been raised by appellant in his appeal.

It is hardly surprising that, when the division opinion was vacated and the appeal placed en banc, appellant, sensitive to the

dicta of the division majority, now asks the full court to reverse the conviction on this ground alone. But this belated perception of an issue not theretofore regarded by either trial or appellate counsel as of significance raises the problems inevitably inhering in this disorderly manner of proceeding, such as the compilation of an evidentiary record in the trial court without reference to the legal issue in question, and, even more importantly in this instance, the failure to focus the trial court's attention upon it in ruling on the motion. Considerations of this nature lie behind the command of Rule 52(b), Fed.R.Crim.P., that matters not brought to the attention of the trial court shall be noticed on appeal only if they constitute plain error affecting substantial rights. Mindful that at no stage of this criminal proceeding prior to rehearing en banc has appellant claimed that any legal injury was inflicted upon him by Officer Simms' look through the window, we weigh the new call for reversal on this ground by the exacting standard of the Rule.

In his supplementary brief to the court en banc, appellant's position is stated to be that the phone call received by the police gave Officers Simms and Betts the right to do no more than to go on the premises to make an inquiry at the front door of the house, forcibly to stop anyone who came to the door, and, if there was at that point an articulable fear of weapons, to pat down the person responding to the inquiry. We think, contrarily, that that is an unnecessarily restricted view of what would constitute reasonable police action under the circumstances obtaining in this case.[9]

In the first place, we note that appellant appears to concede that the tip about the bagging session was a proper subject for investigation by the police, and that that investigation could include going across the premises to reach the house itself. Officer Simms testified that this was precisely what he and Betts did. His testimony further was that, as he and Betts were doing

---

**9.** As the Government points out in its supplemental brief en banc, for the police to have followed the course suggested by appellant would have courted almost certain destruction of the narcotics evidence.

this, he saw the light in the right front basement window. This confirmed to an important degree the information supplied by the tip and, again according to Simms, suggested that whether a narcotics bagging session was in progress could be determined conclusively one way or the other by a look through the lighted window. If nothing of that kind were to be seen, then the police could, as Simms testified they would, depart immediately without disturbing the occupants of the house and with a promising lead having come to nothing.

To take that look required a deviation by only a step or two from the course across the yard which appellant admits that Simms was legally traversing. To the extent that that deviation was an entry upon private property arguably differing in its legal significance from the intrusion already in progress, that difference appears comparable to the "mere 'technical trespass'" which the Seventh Circuit, speaking through Judge Pell, said "did not transform an otherwise reasonable investigation into an unreasonable search." *United States v. Conner*, 478 F.2d 1320, 1323 (7 Cir. 1972).

In *Conner* the police were investigating a tip that a certain building was being used for the dismantling of stolen cars. In an effort to see what was going on in the building, the officers went down a public alley to the rear of the building. They were able to see through an open door activity involving the dismantling of a car matching the description of a stolen one. The problem faced by the Court of Appeals, however, was that it was unclear from the record whether the police had been able to see through the door from the public way or whether they had had to go on to the building lot itself in order to do so. As indicated above, the Seventh Circuit was prepared to assume that the latter was the fact, and still to find that the police action was reasonable within the meaning of the Fourth Amendment.

The phrase "technical trespass" used in the *Conner* opinion was taken from an earlier opinion by Judge Major in *United States v. Hanahan*, 442 F.2d 649 (7th Cir. 1971). In that case a police officer, using a flashlight, peered at night through the window of a locked door of a garage adjoining a house. The police officer testified that he was standing on a sidewalk on the private property, but one that had been used in such manner as to defeat no expectations of privacy if the police entered upon it. It was contrarily urged, however, that the officer had in fact stepped off the sidewalk onto the grass between the sidewalk and the garage itself in order to be able to look through the garage window. This asserted invasion of the curtilage was argued to constitute the taking of a position by the officer on private property where he had no right to be within the meaning of language used in *Harris v. United States*, 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968). The Seventh Circuit, as in *Conner*, was prepared to accept this version of the facts, but concluded that, even so, there was "no more than a technical trespass on the part of the officer," not giving rise to any Fourth Amendment violation. *See also Atwell v. United States*, 414 F.2d 136, 138 (5th Cir. 1969).[10]

---

10. In *State v. Gonzales*, 388 F.2d 145 (5th Cir. 1968), the court, speaking through Judge Thornberry, observed that the existence of a search does not "depend on a trespass under local property law," despite the use by some courts of the common law property concept of the curtilage to define Fourth Amendment boundaries which the police cannot invade without probable cause. There the court found repeated looks by a police officer through the windows of a private house to be unreasonable because of the insubstantial nature of the officer's information that narcotics sales might be going on there. The court, although saying that it is not the law that the police can never accomplish searches by looking in windows, citing its earlier decision in *Brock v. United States*, 223 F.2d 681 (5 Cir. 1955), characterized the police activities immediately before it as a prolonged "fishing expedition." In the case before us, appellant has never claimed that the police did not have information which they were both required and entitled to investigate.

We agree with the *Gonzales* court that common law property concepts are not particularly illuminative of Fourth Amendment problems; and we take the "technical trespass" terminology of the Seventh Circuit as reflecting this same point of view.. The question always re-

There is no uncertainty here as to what Officer Simms did. He testified forthrightly that, seeing the lighted window, he stepped off the walkway on to the grass, a distance which the court found not to be more than two or three feet. But, taking into account the nature of the tip he was investigating,[11] we, no more than the Seventh Circuit, are disposed to find in this circumstance the difference between reason and unreason in Fourth Amendment terms. Translating these terms into the precise issue before us, we do not think that Officer Simms's testimony exposed plain error affecting substantial rights requiring us to reverse this conviction.

## IV

Given the propriety for purposes of this appeal of Officer Simms's look through the window, there can be no serious question that, in light of what he saw, he and Betts could legally have entered the house immediately for purposes of arrest and search. This is, indeed, precisely what appellant argued to the District Court that the police were entitled to, and should, have done. The question becomes one, therefore, of whether failure to do so for a period of 30 to 40 minutes dissipated that right, either because at some point in that interval the police could no longer be said to have had cause to believe that a felony was being committed, or because a warrant should have been obtained during the period of delay.

On the evidence of record, we find no irrationality, as neither did the District Court, in Officer Simms's decision not to enter the house immediately. He testified that he recognized from his quick look through the window that he had come upon a major narcotics distribution operation.

Three men were visible in the room, and more might well have been on the premises, all with a stake in resisting arrest by violence if necessary, and in destroying or concealing the evidence. Aided only by Betts, Simms thought he faced a dangerous situation which not only called for careful handling in order not to lose control over the narcotics but also in effecting what might have to be a forcible entry. He tried to communicate by radio with his superior officer for guidance, but failed for technical reasons. He did not think it wise to summon regular patrol cruisers for fear of alerting the occupants of the house that the police were on hand. Under the circumstances, he thought it best to get to Police Headquarters as fast as possible, which he did. There he was directed to rendezvous with his superior officer, with consequent reinforcement, and to await a further order. That order, when it came, was to enter the house, by force if that should prove to be required.

Whatever problems this may leave unresolved about the need for a warrant, the delay of approximately a half hour did not, we believe, terminate the existence of probable cause, any more than such cause would have disappeared at some point in the much longer time required to get a warrant. If it be concluded, therefore, that, under the circumstances obtaining here, the procurement of a warrant was not essential, the police were legally justified in entering the premises when they arrived on the scene the second time, on the basis of what had been learned by Simms on his first appearance there. We turn, then, to the warrant question.

The warrant clause of the Fourth Amendment is, like the other strictures of that charter, subject to the standard of the

mains one of whether the police action was reasonable under all the circumstances.

11. In his written motion to suppress, far from claiming that Officer Simms acted improperly in looking through the window, appellant cited *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) and *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), in his assumption *arguendo* that

there was probable cause to make a warrantless arrest after the look through the window. *See* pp. —— —— of 182 U.S.App.D.C., pp. 837–838 of 561 F.2d supra. These cases are, of course, highly relevant to the question of the reasonableness of a police officer's actions in relation to the specific information contained in the informant's report.

reasonableness of the official action under the particular circumstances. This is not a case in which that action was taken without any reference whatsoever to the warrant requirement, inasmuch as Officer Simms did not ignore the possibility of obtaining a search warrant. During the interval between the first view through the window and the eventual entry, he had discussed this with a police sergeant and a police lieutenant. The latter called an Assistant United States Attorney who, apprised of the circumstances, expressed himself as of the view that the white powder seen through the window was unlikely to remain at the house very long; and he further said that there was insufficient time to obtain a search warrant before its probable removal, inasmuch as he predicted that it would take from one and a half to two hours at the least to procure such a warrant.[12]

It was only after this consultation that the decision was made to enter the house. The course of conduct followed by the police under these precise circumstances does not seem to us to have been unreasonable,

bearing in mind the grave responsibility they have to detect and to prevent activity which the legislature has labeled as criminal. Officer Simms had obviously come upon a very substantial distribution operation of illicit drugs, and the opinion of a prosecutor experienced in the field, coincidentally expressed to the police, was that speedy action was necessary to assure that the values of that observation in terms of law enforcement could be realized.[13]

The prosecutor's advice in this instance is not, of course, conclusive. But the action of the police in both seeking and following that advice is relevant to the question of whether the decision by the police to proceed without a warrant was reasonable. The trial judge so regarded it in making his ruling, and we think he was well within the bounds of his discretion in doing so.

Confronted with the prospect of substantial delay if a warrant were to be had, there were other relevant considerations for the police to take into account. First and foremost was the fact that the cutting opera-

12. What does give some pause is why the police, faced with a problem of the kind here involved, cannot get speedier action in the matter of a search warrant. *See United States v. Vance R. Robinson,* 174 U.S.App.D.C. 351, 533 F.2d 578 (1976). The testimony was that, although the police are permitted to call the magistrates directly, they are invariably told to get in touch with the United States Attorney's office in order that their information shall be subjected to a prior legal scrutiny before it is transmitted to the magistrate; and it is apparently assumed that this transmission must always be in the form of a formal written application accompanied by an affidavit or affidavits. These assumptions, be they required by statute, rule, or tradition, are plainly not in accord with the facts of life and law enforcement today. With the existence of mechanical transcription equipment, it would appear possible for an oral application to be made for a search warrant, with a meaningful opportunity for the magistrate to give verbal authorization, and with the entire proceedings being recorded for purposes of subsequent review as to their propriety.

It can be plausibly argued that there is nothing in either the Fourth Amendment or the Federal Rules of Criminal Procedure which prevents this from being done today. In any event, the matter appears to be on its way to solution. On April 26, 1976, the Supreme

Court approved, and reported to Congress under 28 U.S.C. § 2072 (1970), a proposal by the Judicial Conference of the United States to amend the Federal Rules of Criminal Procedure (Rule 41) to provide for the issuance of warrants upon oral testimony, which may be given by telephone. Recordation and transcription are, of course, required. On July 8, 1976 the President signed P.L. 94–349, 90 Stat. 822 by which Congress deferred the effective date of a number of the amendments to the Criminal Rules as proposed by the Supreme Court, including those to Rule 41 for the purpose in question, until August 1, 1977, or until and to the extent approved by Act of Congress, whichever is earlier.

13. The District Court, having found that the police entry into the house came within 30–40 minutes after the initial view through the window, attributed no significance to the fact that the police did not look through the window again on their return; and we think rightly so. The prosecutor had suggested that possibility, but only if the police were to be away from the scene an hour or more. Since they were back well before that amount of time had elapsed, the prosecutor's suggestion was not applicable by its terms; and adhering to it anyway would only have created an unnecessary risk of alerting the occupants to destroy the evidence.

tion might terminate and the narcotics be removed from the premises. And it is no answer to the force of this consideration that the police alternatively could have staked out the premises for so long as it took to get a warrant. Stakeouts are full of dangers that the objects of it may thereby be alerted to the presence of the police, and can accordingly destroy or conceal the narcotics, thereby frustrating the police entry when it finally comes.

■ The panel majority recognized this weakness in the stake-out approach, but turned it aside by refusing to engage in speculation about the probabilities of the destruction of evidence. But exposure to only a few narcotics cases is enough to know that evidence in the form of narcotics is peculiarly vulnerable to speedy and easily accomplished destruction; and that very vulnerability is something that police officers in the course of their narcotics enforcement duties must be unfailingly conscious of and repeatedly speculate about if they are to function effectively to protect the public interest. The District Court had no basis for second-guessing the police on this question, and it can hardly be said to have erred in refraining from doing so on this record.[14]

■■ There is, thus, no basis for accepting appellant's contention that, although, in his submission, the police were fully empowered to enter the premises for arrest and search purposes at the time of the original observation of criminal activities in progress, that right was lost upon their failure to exercise it immediately. There was, as was conceded by the defense at the hearing, no impropriety in the manner in which the police entry into the house was finally effected. This leaves only the question of whether the scope of the search, which resulted in the seizure of the narcotics and narcotics paraphernalia,[15] was too extensive. This issue, which was not pressed at the suppression hearing nor raised initially on appeal, does not warrant reversal. When the police had seen a crime actually in progress with contraband in plain view, upon entry into the premises they were fully authorized both to make arrests and to seek out the contraband. As the record shows, p. —— of 182 U.S.App.D.C., p. 835–836 of 561 F.2d, *supra*, they found that contraband in the immediate vicinity of the arrests and in the close environs of the point where it had first been seen, albeit hasty efforts at concealment had, as the police had every reason to anticipate,

14. This court's en banc decision in *Dorman v. United States*, 140 U.S.App.D.C. 313, 435 F.2d 385 (1970), with its detailed enumeration of factors relevant to warrantless entries, has been relied upon by both appellant and the panel majority. Since *Dorman* did not involve, as here, an entry by police a short time after they had actually seen a crime in progress, and since *Dorman* upheld a warrantless entry some five hours after the crime there involved had been committed, that case has, on its facts, little resemblance to this one, except as the same result is *a fortiori* indicated. It need not detain us longer than to note that the panel majority was far from uniformly persuasive in dealing with the items on the check list this court compiled in that case.

This is notably true with respect to whether the entry has been peaceable—a circumstance which the *Dorman* court described as of value "in showing the reasonableness of police attitude and conduct." The comment of the panel majority in this regard was that "[W]here the police identify themselves and give those inside the opportunity to surrender, *as was not done here*, the invasion of privacy is less aggrava-

ted." (Emphasis supplied). The underlined assertion of fact is, of course, flatly contradicted by the evidence of record, and no one other than the panel majority has ever maintained otherwise.

The panel majority also erred in applying the factor of the seriousness of the offense. It chose to characterize possession of heroin—the crime of which appellant was ultimately convicted—as not an offense of the gravity contemplated by *Dorman*. However that may be, the crime reported by the informant and seen by Simms in progress was not simple possession but a major heroin distribution operation, which surely no one conversant with the link between that activity and crime generally would regard as less than grave. It was by reference to that latter offense that the police are to be judged under this particular *Dorman* standard.

15. These were the items to which appellant's motion to suppress was directed. The other matters found by the police, *i. e.*, the money and the weapons, do not appear to have been involved in the suppression controversy.

been made. Whether the search power in this instance be viewed as incident to arrest, or as deriving independently from the initial observation of the contraband, the materials in issue here appear to have been sufficiently within its sweep to defeat any faulting of the District Court on a plain error basis.

*Affirmed.*

J. SKELLY WRIGHT, Circuit Judge, concurring:

In view of the special circumstances of this case and the care with which the court's opinion is limited to these circumstances, I am pleased to concur.

LEVENTHAL, Circuit Judge, joined by Judges J. SKELLY WRIGHT and SPOTTSWOOD W. ROBINSON, III:

I concur in Judge McGowan's opinion for the majority. He takes note that appellant's counsel contends en banc that the warrantless entry and search violate the Fourth Amendment because the observation of activities inside the house that established probable cause was made by Officer Simms not from the street, or from the walkway to the house, but only after the officer went onto the grass lawn in order to peer through the basement window. As Judge McGowan's opinion brings out, that issue had not been pressed earlier in the appeal before the panel, but only en banc, when the issue had been identified in dicta in the panel opinion.[1] This is a fair case for application of the rule that we will not reverse in the absence of "plain" error or decide questions not suitably raised.[2]

Fourth Amendment jurisprudence permits seizure, if otherwise reasonable, of "objects falling in the plain view of an officer who has a right to be in the position," *Harris v. United States*, 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968). The same applies to searches that are reasonable in the light of information gained by an officer on plain view from a place where he has a right to be. *Coolidge v. New Hampshire*, 403 U.S. 443, 466–67, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *James v. United States*, 135 U.S.App.D.C. 314, 315 n.1, 418 F.2d 1150, 1151 n.1 (1969).

Does the rule apply when the officer is not in a place where he has a right to be, because he is trespassing on someone else's property? Is the answer, Yes—so long as it can be called a "technical trespass?" Of course, there are differences between trespasses. For example, a trespass in order to do an act that is lawful is at most the misdemeanor of unlawful entry, whereas a trespass in order to commit a felony is a burglary. But in my view calling a trespass "technical" because it is only a few feet away from a place where the person has a right to be would not be responsive to the broad purposes of the Fourth Amendment. The salient question is, was the trespasser in a place where he was encroaching on a reasonable expectation of privacy that comes within the fair intendment of the Fourth Amendment. *Katz v. United States*, 389 U.S. 347, 351–52, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Judge McGowan is quite right "that common law property concepts are not particularly illuminative of Fourth Amendment problems," as the *Katz* case dramatically illustrates. But at least with respect to the home and the surrounding curtilage the protections traditionally accorded from the time of the common law have bearing on the inquiry as to reasonable expectation of privacy.[3]

---

1. This point had not been raised in Johnson's motion at trial. Nor was it pursued by any defense counsel in oral presentation at the suppression hearing.

2. If this were a core Fourth Amendment violation like breaking into a house, it would be subject to notice as plain error. In this case, however, we have an issue that is not specifically controlled by authority, and while I think study and analysis point the likely way of the law, the issue is one that should be focused prior to decision.

3. As Justice Harlan put it, concurring in *Katz*, while the Fourth Amendment protects people, not places, "[t]he question, however, is what protection it affords to those people. Generally, as here, the answer to that question requires reference to a 'place.' . . . Thus a man's home is, for most purposes, a place where he expects privacy, but objects, activities, or state-

Open fields are not within the special protection accorded by the Fourth Amendment to the people in their "persons, houses, papers, and effects." So held *Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924), where Justice Holmes, characteristically laconic, said (265 U.S. at 59, 44 S.Ct. at 446): "The distinction between the latter [open fields] and the house is as old as the common law. 4 Bl.Comm. 223, 225, 226." And indeed Blackstone, after developing the crime of common law burglary, notes that "the law of England has so particular and tender a regard to the immunity of a man's house, that it styles it his castle, and will never suffer it to be violated with impunity." And while "no distant barn, warehouse, or the like are under the same privileges, nor looked upon as a man's castle of defiance," "the capital house protects and privileges all its branches and appurtenances, if within the curtilage or homestall." The notion undergirding the curtilage-open fields distinction, that the law accords special protection to activity within the home and its immediate private surroundings, finds resonance in recent Supreme Court opinions.[4]

The "open fields" doctrine was rightly applied by Judge Haynsworth to observations by revenue agents, who smelled the odor of whiskey escaping through cracks in the siding of a barn, even assuming, what had not in fact been established, that the woodlands in which they were concealed were the property of the defendant. *United States v. Young*, 322 F.2d 443 (4th Cir. 1963). Nor is there quarrel with extension to a still "located approximately 250 yards from the back of a house in the open land beyond the curtilage of the house." *Atwell v. United States*, 414 F.2d 136, 138 (5th Cir. 1969). And it was accurate, too, for Judge Thornberry to accompany this holding with

the observation that "a trespass does not of itself constitute an illegal search." 414 F.2d at 138.

Meanwhile, the Fifth Circuit, in *Monnette v. United States*, 299 F.2d 847, 851 (1962), upheld the search of a building when the odor of mash emanating from the premises had been distinctly "identified at the property line." The holding of *Monnette* is sound enough, but at one point the opinion uses language susceptible of an unsound, and I think plainly unintended, result. The opinion cites *Hester* for the proposition that the Fourth Amendment does not extend to the "grounds surrounding a building." This formulation is too broad an expansion of "open fields." And indeed the court obviously did not mean that all grounds surrounding a building were beyond the Fourth Amendment, for when the court moved from the (olfactory) observation made at the property line to consider the (visual) observation made when the agents went up to the house and peered through the rear windows in an attempt to gain further evidence, the court flatly said "this peering into the dwelling was a trespass certainly and probably violated his right to privacy as well." *Id.* The court was able to bypass that peering trespass only because it had not yielded any information and hence was not material.

The distinction between open fields or woodlands and the grounds immediately surrounding a house would seem plain enough. But it seems to have been blurred in *United States v. Hanahan*, 442 F.2d 649 (7th Cir. 1971). There the court first held that the officer was standing on the sidewalk when he looked into the garage (where defendant was working on stolen cars) and then said that even if the officer

ments that he exposes to the 'plain view' of outsiders are not 'protected' because no intention to keep them to himself has been exhibited." 389 U.S. at 361, 88 S.Ct. at 516.

4. In *Cardwell v. Lewis*, 417 U.S. 583, 593, 94 S.Ct. 2464, 2471, 41 L.Ed.2d 325 (1974), the Court upheld the warrantless seizure of an unoccupied car parked in a public parking lot, as a seizure "from a public place where access

was not meaningfully restricted," distinguishing the seizure of an automobile on a private driveway in its earlier decision in *Coolidge v. New Hampshire, supra*, as "requir[ing] an entry upon private property." These plurality opinions are discussed in *United States v. Vance E. Robinson*, 174 U.S.App.D.C. 351, 355 n.8, 533 F.2d 578, 582 n.8 (en banc, 1976).

were standing on "[a] few inches of grass between the sidewalk and the garage," "it was no more than a technical trespass" and *Atwell* established that a trespass is not of itself an illegal search. *Id.* at 654. Of course a trespass is not itself a search, but it may establish that the officer was not in a place where he had a right to be when he made the view that justified the search. For Fourth Amendment purposes an officer has a right to be in open fields, etc., where there is no Fourth Amendment expectation of privacy, but does this apply to the lawn around a house? The opinion was not careful about such matters.

*Hanahan* was improved upon in *United States v. Conner*, 478 F.2d 1320 (7th Cir. 1973), where Judge Pell held that the observation of the garage was permissible whether made from the alley (a public way) or the adjoining apron outside the rear door of the garage. While he noted that it would be a technical trespass if the police were on the adjoining apron, his key discussion stresses that this apron adjoining the alley "was not fenced off from the alley" and hence the situation was such that the defendants "had no reasonable expectation of privacy." *Id.* at 1323.

The core issue is reasonable expectation of privacy. That is the kernel of the cases upholding warrantless searches based on plain view observations from a place where the officer had a right to be. In my view while Fourth Amendment protection would not extend to observations by persons using the paved way from the sidewalk to the door of the house, it would likely extend to evidence obtained by walking onto the lawn around the house and then peering into windows.[5]

MacKINNON, Circuit Judge, concurring:

I join the majority opinion and agree that the search was valid for the reasons there stated. I also believe that additional grounds exist for finding the search to be valid, and some further comment on the dissent and the separate concurrence is required. All are agreed that "objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." *Ker v. California*, 374 U.S. 23, 42–43, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); *Harris v. United States*, 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968). The controlling issue then is whether the police officers here had a right to be in the position where they were when they obtained their "plain view."

1. *The Dissent's Position.*

The dissent adopts the position that "the government would [never] be able to justify a search on plain view grounds when it was necessary for the [police] officer to trespass in order to achieve the view." Dissent at —— of 182 U.S.App.D.C., at 858 of 561 F.2d. In applying this statement of the law it finds that the present entry of the police on the grass was a prohibited entry and constituted a trespass. In finding such entry by the police officer to be a trespass, and further *assuming* its unlawfulness, the dissent thus assumes the point for decision—the linchpin of the dissent is the *assumption* that the officer's entry on the three feet of grass was an illegal trespass and rendered the resulting search unreasonable. That position is not supported by the case law.

---

5. *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), is entirely congruent with the observations in this opinion. In a different context, the Court decided that the rule of *United States v. Watson*, 423 S.Ct. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), permitting warrantless arrest upon probable cause when effected in a "public" place, applies to the arrest of an individual standing in the doorway of her house who on seeing the police retreats into the vestibule of her dwelling. The Court stated, citing *Katz*, that what a

person knowingly exposes to the public is not the subject of Fourth Amendment protection, and further that although "under the common law of property the threshold of one's dwelling is 'private,' as is the yard surrounding the house," a person standing in the doorway of her dwelling "was not in an area where she had any expectation of privacy." *Santana* "was not merely visible to the public but as exposed to public view, speech, hearing and touch as if she had been standing completely outside her house." 427 U.S. at 42, 96 S.Ct. at 2409.

848

## 2. The Right and Duty of Police Officers.

Not only is it highly questionable whether a police officer's presence on private property constitutes a trespass, when such entry is in conformance with his duties, but even if it did, it would be justifiable. After all, policemen are empowered and duty-bound to enforce the law on private property as well as on public property. Policemen are public officers, just like judges, who have a right and sworn duty to enforce the law—particularly the criminal law. This obligation extends to private as well as public property and is just as obligatory in the dead of night in highly dangerous circumstances as it is in the daytime in safe surroundings. Their duty is very difficult because our law throws extraordinary safeguards around criminals and what is normal police conduct in most countries is prohibited in the United States. Also, our police forces are relatively small. This requires our police officers to rely greatly on citizen support to stop crime and apprehend those who violate the law. Law-abiding citizens constantly report law violations to the police—by all methods. In some of these reports, written and oral, the citizen identifies himself and in others he chooses to have his name kept confidential or his report is made anonymously. These reports by citizens are one of the hallmarks of a civilized society and lead to the discovery of much criminal activity. Police officers would be

derelict in their duties if they did not take reasonable steps promptly to ascertain the correctness of reports of unlawful acts that carry a reasonable suspicion that major criminal laws are being violated in plain view from the outside of a building.

Under the facts here present the police had a right and duty to walk up the sidewalk, step two or three feet onto the grass and *further* verify the accuracy of the anonymous telephone report by observing what was in plain view from outside the house. This involved no breaking and entering whatsoever—their access was not restricted in any way—the house was not even touched and the result was the verification of the second part of the telephone report, *i. e.*, that a large quantity of contraband narcotics was present where it was plainly visible from outside the house. The first part of the anonymous report had already been verified when the police observed that the light was on in the precise place (the basement window), in the precise manner (so that those in the basement were visible from outside), and at the precise address, that the telephone report had stated. The observation of large quantities of narcotics inside the house furnished probable cause to enter the house and justified the arrest of the principals and the search and seizure of the large quantity of contraband heroin. The police acted throughout in a reasonable manner—that is the test.[1]

---

1. This is not to suggest that the anonymous tip gave the police probable cause to enter and search the house. It merely gave them, in the context of this case, authority to take a closer look and verify the tip from outside the house in the reasonable manner that they did. The exigent circumstances were then obvious and thereafter it was reasonable for the police to enter the house and make the arrests and the search. This factual situation has many similarities to that involved in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), where the Supreme Court in a decision written by Chief Justice Warren, with only one dissent, held that it was not unreasonable to effect a "seizure" of an individual on the street, "stop-and-frisk" him and then arrest him on the basis of what was found. The decision authorizing the initial "seizure" in *Terry* represented the same refinement of *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Beck v. Ohio*, 379 U.S. 89, 85 S.Ct. 223, 13

L.Ed.2d 142 (1964) and *Chapman v. United States*, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961), that the outside verification here represents as to *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). The authority to proceed further was derived from the frisk in *Terry*, and *Aguilar* does not foreclose a finding that the police acted reasonably in this situation. *Aguilar* involved the constitutional requirements for the issuance of a search warrant and did not involve the existence of exigent circumstances found by officers on the beat. Its pronouncements are not to be taken from context and applied or rejected in a wooden manner. (*See* dissent, n.1.) As *Terry v. Ohio*, 392 U.S. at 19–20, 88 S.Ct. 1868, teaches, the initial approach is to be tested by the standard of reasonableness, in light of the exigent circumstances present both here and in *Terry*. Evidence obtained from that original approach could lead to probable cause, but the initial

That the police acted as resolutely as they did in the dark of night should call for public commendation. That is part of the dangerous duties of policemen—knocking at strange doors in the nighttime not knowing what danger lurks behind them, going up dark alleys (many times alone) and into suspicious and highly dangerous places in order to protect individuals and property, to prevent crime and to enforce the law. That is what citizens pay taxes for. That is one of the purposes for which police departments are organized and policemen are hired. In the last five years in the United States, 640 police officers were feloniously killed in the performance of their duties.[2] Their "peering" into windows and entering on strange premises, when reasonable suspicion brings them there in exigent circumstances, could save the lives and property of the occupants of the house. That is not duty for the fainthearted and many intentionally avoid it, but the men who have the ability and the manly courage to respond in such dangerous imperative emergencies should not be branded as "trespassing prowlers," dissent at —— of 182 U.S.App. D.C., at 858 of 561 F.2d, and the law does not do so. Police officers have a different status. They are public officers specially chosen to enforce the law. They are the friends, not the enemies, of the law-abiding citizen.

The question then remains: when is an entry by a police officer onto the private property of another within "the performance of his duty."

Suppose, instead of an $85,000 illegal narcotics operation, the anonymous telephone caller had reported under identical circumstances that (1) the owners of the house were holding a hostage at gun point in the basement room and torturing him in an attempt to learn the combination of a store safe containing a large amount of money; (2) that a man was beating his wife and would kill her if he was not stopped; (3) that several bank robbers where bankers and policemen had been killed were dividing the $85,000 they had stolen; or (4) that several men were raping a woman in the basement room of the house. Would any person deny that the policeman had a right and duty *immediately* to step three feet onto the lawn and verify the accuracy of the anonymous telephone reports by a mere glance in exactly the manner that the police did here? Or, should the police be required first to check the title to the property and go to the police station and go through the necessary paper work to obtain a search warrant? (Could they get one on an anonymous report?) I just hope if some person calls the police and says he believes some robbers are robbing me in my house or some friends of mine are using my house to bag $85,000 worth of contraband drugs, and they can be easily seen from the outside, that the police will act immediately and not be afraid to step onto the grass to verify the report. An anonymous tip describing such felonious activities (Tr. 803, 768–775) capable of such easy verification (*Id.*), deserves something better than to be ignored by public officers who are employed and authorized to enforce the criminal laws.

Reasonableness is the constitutional test and there is nothing unreasonable in such conduct—it would be highly unreasonable for the police not to enter on the property to verify the report without any hesitation. In doing so "the constable" did not "blunder," dissent at 13, he merely carried out his sworn duty.

inspection (*not* a full-scale "search of a home") is defensible if reasonable. This view the dissent ignores.

Moreover, in this case the visual glance through the window from the outside is not as much a search as the temporary seizure and frisk in *Terry* and the officers had a more substantial basis here in the anonymous tip (*cf. Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959)) when it was partially verified from the street sidewalk (I–M, Tr. 21) by seeing the light emanating from the basement window, than existed in the conclusory suspicion in *Terry*.

2. The actual numbers by year are as follows: 1975: 129; 1974: 132; 1973: 134; 1972: 116; 1971: 129. Federal Bureau of Investigation, *Crime in the United States—1975*, Uniform Crime Reports 223 (Washington, D.C., 1976).

3. *Reasonable Searches and Exigent Circumstances.*

The above described situations are what Justice Douglas had in mind when he referred to instances where "officers are . . responding to an emergency [and] . . . the exigencies of the situation made that course imperative." *McDonald v. United States*, 335 U.S. 451, 454, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948). What else should the police do? Lay siege to the home and expose the neighbors to a possible gun battle and a shoot-out[3] for two hours while they look for a U.S. Attorney, return to headquarters, have stenographers type out affidavits and find a magistrate at 1:00 a. m. to issue a search warrant; then when they enter the house the men say they were just playing dominoes and there are no contraband drugs because they were destroyed in the interim?

All these situations involve imperative emergencies—exigent circumstances. Crimes are under way and the criminals will not stand still long enough for the police to do any paper work and still stop the crimes or catch the criminals with evidence sufficient to convict them.[4] If the procedure the dissent requires is followed, (1) the robbery will succeed, (2) the wife will be killed, (3) the bank robbers will escape, and (4) the woman will be gang-raped and all the criminals will evade capture and conviction. Is it reasonable for a policeman to stand idly by and permit such almost certain results? The instant case involves the same type of imperative emergency. The crime here is of a different nature, but the $85,000 drug operation is as substantially damaging to society as are the four postulated situations, and experience teaches that these criminals were likely to escape with the evidence if they were not apprehended quickly. The strong likelihood of the imminent removal of the contraband drugs is an unusual circumstance justifying a warrantless search. *United States v. Blake*, 484 F.2d 50 (8th Cir. 1973), *cert. denied*, 417 U.S. 949, 94 S.Ct. 3076, 41 L.Ed.2d 669 (1974).

4. *The Law with Respect to Police Officers.*

The entry upon [the defendant's] property, [by a police officer] even if made *without probable cause*, does not necessarily constitute a trespass. *When the performance of his duty requires an officer to enter upon private property, his conduct, otherwise a trespass, is justifiable.* Giacona v. United States, 257 F.2d 450 (5th Cir. 1958), cert. den., 358 U.S. 873, 79 S.Ct. 113, 3 L.Ed.2d 104; *Foster v. United States*, 296 F.2d 65 (5th Cir. 1961); *United States v. Sterling*, 369 F.2d 799 (3d Cir. 1966).

*United States v. Knight*, 451 F.2d 275, 278 (5th Cir. 1971), *cert. denied*, 405 U.S. 965, 92 S.Ct. 1171, 31 L.Ed.2d 240 (1972) (emphasis added).

A trespass upon the grounds surrounding a building does not constitute an illegal search because the protection of the fourth amendment does not extend to the grounds.

**3.** The newspaper the day this was written described just such an operation to capture two men involved in a narcotics operation. It involved 17 flak-jacketed special project section policemen; riot helmets, a barricade truck and cruiser, cordoning off the area, limiting escape routes for the gunmen (narcotics suspects), keeping bystanders out of line of fire, pump fire shotguns, rifles, additional .38 caliber sidearms carried by all policemen, other firearms they refused to specify, tear-gas canisters, generator and flood lights. Headquarters were set up in an adjacent grocery store commandeered next to the gunmen's refuge. Guns were constantly trained on the building housing the gunmen. The police operated on the premises, "We had to be sure . . . We don't make assumptions." Eventually, even though some men came out, the policemen, wearing flak jackets, had to run into the building, to see if any more were inside. Only one bullet had caused any damage. The entire operation took 2½ hours. Washington Post, Nov. 27, 1976, § A, at 10.

**4.** This court has held that an arrest is presumptively invalid when proof of the arrest and its circumstances is not properly preserved in the field, *Sullivan v. Murphy*, 156 U.S.App.D.C. 28, 57, 478 F.2d 938, 967, *cert. denied*, 414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (1973), and a cause of action for damages will lie against the responsible officials in such a case, *Apton v. Wilson*, 165 U.S.App.D.C. 22, 506 F.2d 83 (1974).

*Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924); *Martin v. United States*, 155 F.2d 503 (5th Cir. 1946); *Foster v. United States*, 296 F.2d 65, 67 (5th Cir. 1962); *Monnette v. United States*, 299 F.2d 847, 850 (5th Cir. 1962); *Atwell v. United States*, 414 F.2d 136, 138 (5th Cir. 1969). The policeman's function authorizes him to take a closer look when he confronts suspicious circumstances on the streets. *Cf. Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

*Hester* held permissible, not even to be considered whether it was reasonable or not, an unconsented entry by a police officer of from 50 to 100 yards over *open fields*. The holding being that the fourth amendment applied to "persons, houses, papers and effects"—not to open fields. *Atwell v. United States*, 414 F.2d 136, 138 (5th Cir. 1969) holds that a similar unconsented entry over 250 yards of an open field did not constitute a fourth amendment violation. There is no substantial difference between running over 50 to 250 yards of an open field, and stepping off a residential sidewalk 2 to 3 feet onto an open lawn in the city, unless it is that stepping onto the open lawn involved an act of much less magnitude, is more reasonable and indubitably more frequent in a large metropolitan city.

### 5. *Expectation of Privacy.*

What is the standard for a justifiable entry onto private property in such circumstances? We know that that standard is less than probable cause, or some of the above quoted decisions would be illogical. The concurring opinion suggests that *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) provides the answer (concurrence at —— of 182 U.S.App.D.C., at 851 of 561 F.2d) when it states that the answer turns on whether the individuals involved had a "reasonable expectation of privacy." If that test were controlling here the defendants' would lose hands down for no person could *reasonably* expect that his large scale illegal activities would remain private, particularly from another occupant (Fudge) of the premises, if he carried them on in a heavily populated area at night, in a brightly lighted room, in front of a window that afforded full visibility to those standing on the outside. The illegal activities here were *not* private because one of the occupants of the property observed them and reported them to the police.

Undoubtedly, the test of "reasonable expectation of privacy" has to be addressed in any evaluation of a police officer's entry onto private property. In cases such as *United States v. Hanahan*, 442 F.2d 649 (7th Cir. 1971), the sighting by the police officer through defendant's garage window was made from a sidewalk, or just a few inches onto the defendant's property, but the view was not better from one vantage than the other. Hence, since the defendant could have no reasonable expectation that items kept in the garage would remain free from viewing from the public sidewalk, he had no such expectation even if the viewing actually occurred from a few inches closer, trespass or not.

But the problem is not solved simply by invoking the rule in *Katz*. That rule incorporates a fair amount of circularity. One will have a reasonable expectation of privacy over those areas that courts tell him he may reasonably expect to be private. Reference to another standard than plain view is also required. The concurrence and dissent both discuss this case as though the only justification proposed was plain view. But another principle is needed to determine whether the vantage point from which the plain view is made is a place where the police officer "has a right to be." *Harris v. United States*, 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968). If it is the search is legal.

That other principle, operative in this case, recognized in many other judicial opinions, and referred to above, is exigent circumstances. *Cf. McDonald v. United States, supra.* This is the factor that determines whether the police officer's entry, even without probable cause, is within the "performance of his duties." And it must, as a matter of law, be recognized that no one can have a reasonable expectation of

privacy over those objects in plain view of police officers in the performance of their duties.

That "performance of duties" requires less than probable cause has already been established. The full contours of that standard are best demonstrated by reference to the case law.

In *United States v. Brown*, 487 F.2d 208 (4th Cir. 1973), *cert. denied*, 416 U.S. 909, 94 S.Ct. 1490, 39 L.Ed.2d 575 (1974), revenue agents entered onto defendant's property, and approached to within ten feet of his barn, which building the court conceded was within the curtilage. At that point, the agents detected the odor of fermentation, and that evidence was subsequently relied upon in obtaining a warrant to search the barn. Though the initial entry was trespassory, the court held that odors emanating onto open areas should have been expected to be sensed, and hence no reasonable expectation of privacy in the *Katz* sense had been invaded.

In *United States v. Bustamante-Gamez*, 488 F.2d 4 (9th Cir. 1973), *cert. denied*, 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974), the extra step of eventually seeking out a search warrant was not taken. Once again, the only reason the peace officers entered on the property was to obtain evidence—in that case a car possibly stored within a garage and containing marijuana. The court admitted that while the circumstances (involving having lost sight of the car in question in a rather narrow neighborhood) could have been handled through waiting for a search warrant, and that trespassing to eavesdrop was not to be a favored police technique, *exigent circumstances* justified the eventual search, the trespass that was conceivably involved was not *per se* cause to condemn a search as unreasonable. This was in spite of the fact that, as the court found, "the officers had cause to believe only that the car, loaded with contraband, was in the garage. Entering the driveway was for purposes of 'search'—*i. e.*, to overhear."

The Ninth Circuit did not even reach the question of a *Katz*-type invasion of privacy because of the possibility that the delay needed to seek a warrant, or the inconvenience necessitated by cordoning off the area, could lead to the destruction of evidence the officers then knew to be present. 488 F.2d at 8, 9. That knowledge came from overhearing voices in the garage, but the entry to be in a position to overhear was not based on any informed tip or any other information except that the car had disappeared in the vicinity.

The Fifth Circuit has decided an analogous case in *United States v. Knight*, 451 F.2d 275 (5th Cir. 1971), *cert. denied sub nom. Grubbs v. United States*, 405 U.S. 965, 92 S.Ct. 1171, 31 L.Ed.2d 240 (1972). The original suspicion of a locality was based on a reliable informant, and by an aerial sighting of a truck resembling the stolen one. However, the court did not sanction the entry onto defendant's property as legal on these grounds. A warrant could have been sought, but it was not. The court looked to the practicalities of the situation, and concluded:

> When the performance of his duty requires an officer to enter upon private property, his conduct, otherwise a trespass, is justifiable. Here the original tip plus the sighting from the air dictated a police investigation to determine whether stolen goods were being transported. *Under the circumstances an entry onto the property for the purpose of making a general inquiry was justifiable.* Moreover, even if the officers were trespassing on private property, a trespass does not of itself constitute an illegal search [citing cases].

451 F.2d at 278 (emphasis added). Once upon the property, the police officers observed further evidence which gave rise to a full scale search and seizure. It also appears that, in this case, an occupant of the property (the anonymous informant) consented to the search. But it is not necessary here to place any reliance upon such fact to support the validity of the search.

The most common characteristics of an entry to gain a vantage point for audio, olfactory, or visual observation are awareness of the likely presence of evidence, the potential for destruction of that evidence (though a lower standard is required than

actual knowledge that suspects possessing evidence have discerned police officers' impending arrival), and the impracticality in terms of inconvenience to innocent persons, possibility of tipping-off suspects, or wasted time, of cordoning off the area and waiting for probable cause to arise. The presence of several of these characteristics has been noted in the majority opinion in this case. (Maj. op. at —— of 182 U.S.App.D.C., at 843 of 561 F.2d).

The *Katz* decision did not vitiate all prior case law and common law on searches. It requires reference to standards of reasonable expectation built up around that prior law. One such standard which has persisted after, and helped provide meaning for, *Katz* is the legitimacy of police entry onto open areas, even though privately owned, in the course of an investigation. Once that entry has been accomplished, the plain view test will apply as to evidence subsequently obtained. It is clear from all the foregoing that the police officers had a right to be in the position they were when they obtained their "plain view." Accordingly, the search was legal.

1. Probable cause did not exist until the police had peered through the basement window. An anonymous tip by itself cannot constitute probable cause. *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). Nor was the tip sufficiently corroborated when the officers initially saw the light emanating from the basement window to satisfy *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1958). As in *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), the police here independently corroborated only one small detail of the anonymous tip whereas in *Draper* the police independently corroborated a detailed tip in all but one unimportant respect.

Judge MacKinnon, does not contend, as indeed he could not under *Aguilar*, that the anonymous tip gave the officers probable cause to search. In fact, he twice appears to concede that probable cause did not exist. (Concurring draft at ——, —— of 182 U.S.App.D.C., at ——, 849–853 of 561 F.2d). Nevertheless, he argues that the anonymous tip created exigent circumstances that justified the search. However, the existence of exigent circumstances merely permits the searching officer to by-pass the warrant requirement. *Warden v. Hayden*, 387 U.S. 294, 298, 299, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1966). Exigent circumstances have never been thought to substitute for probable cause.

BAZELON, Chief Judge, dissenting:

The probable cause supporting the warrantless entry, arrest, search and seizure of evidence in this case was gained when police officers knowingly trespassed on a private lawn in order to peer through a basement window.[1] The panel opinion in which I joined concluded that this search was unlawful. I continue to believe this conclusion is accurate and that the subsequent intrusions were thereby rendered unlawful. *See United States v. Ralph Johnson*, No. 73–2221 June 16, 1975, slip at 714–16. Although the panel opinion did not rest solely on this issue because it had not been briefed on appeal, upon further reflection I feel that the illegality of the initial window observation provides a sufficient as well as the sturdiest basis for invalidating the police action.

## I. APPLICABILITY OF THE PLAIN ERROR RULE

The majority asserts that the window search issue is appealable only under the

*Compare, Dorman v. United States*, 140 U.S. App.D.C. 313, 321–323, 435 F.2d 385, 393–95 (1970) (en banc) (probable cause must be clearly shown to justify warrantless search, especially at night).

Nor can the window search be justified by analogy to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See* note 9 *infra*. *Terry* does not, as Judge MacKinnon's opinion implies, read probable cause out of the Fourth Amendment by making "reasonableness" the sole test of constitutionality. In creating an exception to the probable cause requirement, the *Terry* Court clearly reaffirmed the principle that probable cause was generally required, 392 U.S. at 20, 88 S.Ct. 1868. Under *Terry* reasonableness is the exclusive test of constitutionality only when, as is the case with brief, on-the-street encounters, the police conduct in question "historically has not been, and as a practical matter could not be, subjected to the warrant procedure." 392 U.S. at 20, 88 S.Ct. at 1879. It could not seriously be maintained that searches of a home for evidence of criminality fall into this category. And even if resort to the warrant procedure would have been impractical in this case, *Terry* also reaffirms that such exigent circumstances only eliminate the need for the warrant, not the need for probable cause. *Id.*

plain error rule because the appellant himself did not raise the issue at the suppression hearing.[2] Rule 52(b) Fed.R.Crim.P. states, "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." This rule is primarily grounded in considerations of fairness to the opposing party and preservation of the integrity of the trial court. *United States v. Atkinson*, 297 U.S. 157, 159, 56 S.Ct. 391, 80 L.Ed. 555 (1936). Having carefully examined the transcript of the suppression hearing, I am convinced that the unlawfulness of the window search was "brought to the attention of the court" with sufficient clarity to take this case out of the plain error rule.[3] Nor should the plain error rule be invoked because appellant did not raise the issue of the window search in his argument before the panel; the panel properly determined the legality of the window search and the government has had ample opportunity to defend that search on rehearing. In any event, even if I am mistaken in either of these two conclusions, invoking the plain error rule should not affect the outcome of this case because the error here clearly affected substantial rights.

Appellant was tried jointly with five other defendants accused of the same crime. Although at the trial the court recognized the divergence of the defendants' interests, (T.T. pp. 25, 26), at the suppression hearing the trial judge naturally and correctly assumed the interests of the individual defendants were the same.[4] Before allowing any witnesses to be heard, he said to the six defense counsel:

Very well. Now which counsel will serve as spokesman for the defense counsel to make a statement, preliminary statement, as to what the position of the defense is? (M.T. Nov. 1, p. 7).

The trial judge later allowed the other counsel to supplement lead counsel's remarks, as well as to cross-examine the government witnesses, but his question clearly shows he was prepared to treat issues raised by one defendant at the suppression hearing as being raised by all.

Later statements by the trial judge confirm this view. For example, counsel for defendant Riggins, the third counsel to cross-examine Officer Simms, asked Simms if he knew he was on private property when he looked through the basement window. Simms replied, "Yes, sir, I stated previously I knew it was private property." At this point, the trial judge broke in and said, "Counsel, now don't make your questions so repetitious. * * * * I think it is well established it was private property." (M.T. Nov. 1, pp. 99–100). After hearing this rebuke, it would have been absurd for appellant's counsel to reestablish points previously made when his turn for cross-examination or argument arose.

With the suppression hearing conducted in this posture, the issue in determining the applicability of the plain error rule is not whether appellant's counsel personally raised the issue of the window search. Rather, it is whether the issue was raised by the defense team with sufficient clarity to put the government and the trial court on notice that the issue had been raised. The record quite clearly indicates that both were.

As noted above, the various defense counsel elicited testimony from Officer Simms at more than one point to the effect that he knew he was trespassing when he looked

---

**2.** The majority never makes clear how it feels the plain error rule changes the result in this case.

**3.** Judge Leventhal in his separate concurrence recognizes that the issue of the window search was brought to the attention of the trial court. He concludes, however, that the record is not sufficiently developed to permit appellate review on this issue. If this were correct, which I doubt, *see* note 10 *infra*, I see no reason for penalizing appellant by refusing review alto-gether. Since the legality of the window search has been properly raised, the very least required by fundamental fairness is to remand this case to the trial court to take further evidence on any inadequately developed factual issues.

**4.** This is so even though the defendants had not all joined in one motion to suppress. (M.T. Nov. 1, p. 7.)

through the window. (M.T. Nov. 1, at 93, 99, 100). Moreover, at oral argument on the motion to suppress, one defense lawyer squarely challenged the window search, arguing:

> Your honor, in reviewing the testimony I would point out that first of all the police had an anonymous call. That in itself would not be sufficient to enter the premises.
>
> Secondly, Officer Simms stepped upon the private property of individuals in order to look through the window to see the activities that then gave some corroboration to the anonymous call.
>
> *We maintain this stepping on private property* just the anonymous call in and of itself *was illegal* (M.T. Nov. 9, p. 46) (emphasis added).

Furthermore, the government counsel at oral argument countered this argument at some length concluding that the initial intrusion, "if in fact it was one . . . was a lawful one or a reasonable one in taking into consideration all the circumstances." (M.T. Nov. 9, pp. 55–6).

The majority is concededly correct in observing that the unlawfulness of the window search was not the primary argument for suppression. However, the issue was clearly brought to the attention of the trial judge and the government through testimony and argument, and that is all Rule 52(b) requires.[5] It seems plain therefore that the plain error rule is not applicable on appeal on the grounds appellant did not challenge window search at the suppression hearing.

Nor can it reasonably be suggested that the en banc court should not review this case under ordinary principles of review; the policies underlying the plain error rule do not require its application. The challenge to the window search has been expressly brought to the attention of the trial court and this court en banc, so neither the government nor the court system has been prejudiced in any way by the failure of appellant to address the issue before the panel. The Government has in fact defended the window search at the suppression hearing and in its brief and argument before the en banc court.

Furthermore, even if I am mistaken and the plain error rule should be applied in this case, the panel acted properly in determining the legality of the window search. An appellate court can notice sua sponte a plain error affecting substantial rights not brought to its, as opposed to the trial court's, attention. *Silber v. United States*, 370 U.S. 717, 82 S.Ct. 1287, 8 L.Ed.2d 798 (1962); *United States v. Atkinson, supra,* and *Tatum v. United States*, 88 U.S.App. D.C. 386, 190 F.2d 612 (1951). Here there can be little question that the unlawful window search "affected substantial rights" within the meaning of Rule 52(b).[6] Al-

---

**5.** The fact that the window search was clearly though not strenuously challenged before the trial court sets this case apart from other cases where this court has invoked the plain error rule. In *United States v. White*, 139 U.S.App. D.C. 32, 429 F.2d 711 (1970), the court refused to find plain error in the admission of evidence where the appellant neither filed a motion to suppress the evidence nor objected to its admission at trial. *United States v. Smith*, 160 U.S.App.D.C. 221, 490 F.2d 789 (1974), is similar. There the appellant did not object at all to the admission of certain damaging evidence until the case was on appeal. *Id.*, at 226–227, 490 F.2d at 794–5. *See also United States v. Diggs*, 173 U.S.App.D.C. 95, 522 F.2d 1310 (1975), and *United States v. Johnson et al.*, 539 F.2d 181 (1976).

Finally, a recent Supreme Court case offers considerable guidance on the question of whether the window search is properly before us. In *Anderson v. United States*, 417 U.S. 211,

94 S.Ct. 2253, 41 L.Ed.2d 20 (1973), the petitioners unsuccessfully sought to advance on appeal a ground for the objection of evidence they had not argued to the trial court. The Supreme Court held that the objection should have been heard, stating:

> In view of the fact that petitioners did challenge the admissibility of the . . . testimony at trial, we think it was proper for the Court of Appeals to consider all grounds related to that underlying objection.

*Id.* at 211 n.5, 94 S.Ct. at 2259 n.5. In this case, appellant is not seeking to advance a new argument on appeal, but rather to give more emphasis to an argument previously made.

**6.** There are cases which suggest that reversal on a plain error rationale requires more than a simple finding that the error was not harmless. *E. g. United States v. Leonard*, 161 U.S.App. D.C. 36, 41–42, 494 F.2d 955, 960–61 (1974); *United States v. Grasso*, 437 F.2d 317, 319 (3d

though the trespass was relatively minor in terms of distance, the information gathered thereby supplies the justification for all of the subsequent intrusions.[7]

## II. THE UNLAWFULNESS OF THE WINDOW SEARCH

Warrantless arrests and searches are, with only a few narrowly defined exceptions unreasonable per se, *e. g. Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1971), and the government bears the burden of demonstrating the applicability of an exception, *Coolidge v. New Hampshire*, 403 U.S. 443, 455, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). In this case, the only exception arguably applicable is the "plain view" doctrine as expressed in *Harris v. United States*, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed. 1067 (1968). In *Harris*, the Court wrote that "objects falling in the plain view of an officer *who has a right to be in the position* to have that view are subject to seizure and may be introduced in evidence." *Harris, supra*, 390 U.S. 236, 88 S.Ct. 992, 19 L.Ed. 1067. (emphasis added).

Although the majority never expressly states that it is affirming the window search under the plain view doctrine, this is evidently what it has in mind when, quoting language from Seventh Circuit plain view cases,[8] it concludes that a mere "technical trespass" "did not transform an otherwise reasonable investigation into an unreasonable search." (Majority opinion p. —— of 182 U.S.App.D.C., p. 841 of 561 F.2d) Conceptually, an officer has not conducted a search when he merely observes something that is in plain view. *United States v. Hanrahan*, 442 F.2d at 663; *Ponce v. Craven*, 409 F.2d 621 (9th Cir. 1969). However, as *Harris* makes clear, the plain view exception operates only when the officer is positioned in a place where he has a right to be. If the rule were otherwise, the police could eviscerate the warrant requirement by maneuvering themselves into positions where the object being sought was plainly within view, regardless of its location. The thrust of the majority's argument must be that, for the purposes of *Harris*, an officer is not to be considered as being in a place where he has no right to be when his trespass onto private property is minimal.[9]

Cir.), *cert. denied*, 403 U.S. 920, 91 S.Ct. 2236, 29 L.Ed. 698 (1971). Fed.R.Crim.P. 52(b), however, makes plain errors and trial defects cognizable if they affect "substantial rights," the precise standard under which Fed.R.Crim.P. 52(a) requires courts to determine whether an error is harmless. And there are numerous cases where courts have reversed on plain error without finding a "manifest miscarriage of justice" or similarly grave abuse. *E. g., United States v. McClain*, 142 U.S.App.D.C. 213, 218, 440 F.2d 241, 246 (1971); *King v. United States*, 125 U.S.App.D.C. 318, 372 F.2d 383 (1967). In any event, I think the harm to appellant is sufficient to meet a threshold higher than simple prejudice, if one is appropriate, particularly in light of the presumption that serious doubts should be resolved in defendant's favor established by *Kotteakos v. United States*, 328 U.S. 750, 764, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

7. Since the plain error rule presupposes the existence of error, but the majority appears to conclude that the window search was lawful, Majority opinion, p. —— of 182 U.S.App.D.C., p. 841 of 561 F.2d, and since the majority never suggests that an error was committed that was not "plain" or did not "affect substantial rights," there seems to be no logical necessity for dragging plain error into this case.

One must wonder why the majority has done so for a purpose other than rhetorical. By relying on the plain error rule, the majority is able to avoid expressly deciding that the window search was lawful while leaving the strong suggestion that it was. The majority simply concludes "we do not think that Officer Simms's testimony exposed plain error affecting substantial rights requiring us to reverse this conviction," a statement of law which, I submit, has no analytic meaning beyond the bare result.

8. *United States v. Conner*, 478 F.2d 1320, 1323 (7 Cir. 1972); *United States v. Hanahan*, 442 F.2d 649 (7 Cir. 1971).

9. The majority's discussion of the *Hanahan* case on p. —— of 182 U.S.App.D.C., p. 841 of 561 F.2d (1968), lends credence to this summary of its argument. It is possible, however, to read the majority as justifying the search on the basis of an analogy to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), in accordance with a suggestion found in the Government's supplemental brief. P. 9, f. 11. The argument would be that the window search was reasonable because it was the least intrusive means by which the police could corroborate the veracity of the anonymous tip. I

I have several difficulties with this argument. First, the trespass cannot be dismissed out of hand because it was minimal in terms of distance.[10] In both *Hanahan* and *Conner* the Seventh Circuit was able to label the inadvertent police trespasses as "technical" and therefore irrelevant because they did not enhance the ability of the police to view the objects observed. In each case, the court specifically found that, whether or not the observing officer's foot happened to alight on the thin strip of grass separating the garage window through which the observation was made and the public sidewalk on which they were standing, the officers could and did view the interior of the garages from the public sidewalk. *United States v. Hanahan*, 442 F.2d 649, 654 (7 Cir. 1971), *United States v. Conner*, 478 F.2d 1320, 1323 (7 Cir. 1973). Here, to the contrary, the government has not satisfied its burden of demonstrating that the officer's trespass was technical in the sense of being similarly immaterial. Thus, I cannot disregard the trespass in order to conclude that Officer Simms was in a place where he had a right to be when he peered through the window.

Second, the Supreme Court has repeatedly stressed that the exceptions to the warrant requirement are narrow in scope. *Coolidge v. New Hampshire*, 403 U.S. 443, 445, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1970), *United States v. Jeffers*, 342 U.S. 48, 51, 72 S.Ct. 93, 96 L.Ed. 59 (1951). Here, even though the legality of the window search was challenged at the suppression hearing the government never demonstrated that it fell within one of the recognized exceptions to the warrant requirement. To the contrary, Officer Simms's testimony strongly suggests that the plain view doctrine cannot justify the window search. Simms admitted he knowingly trespassed to accomplish the search, that he knew he was not, to use the words of *Harris*, in a place where he had a right to be.

Furthermore, I agree with Judge Leventhal's observation that focussing on whether a trespass is minimal in terms of distance is not responsive to the broad question of the Fourth Amendment, which is, as he correctly observes, whether the trespasser "was encroaching on a reasonable expectation of privacy that comes within the fair

do not read the majority as making this argument. The majority devotes the bulk of its opinion to a discussion of the substantiality of the trespass. If they were making a least intrusive means argument, the substantiality of the trespass would be irrelevant so long as it was the least substantial trespass necessary to accomplish the search. Furthermore, I do not, unlike Judge Leventhal, believe fuller factual development is necessary to appraise whether this trespass can be justified along these lines. If, for example, a warrantless search without probable cause accomplished by a substantial trespass could be justified as the least intrusive means of corroborating a tip, then it is hard to imagine what would be protected under the Fourth Amendment. This contention is, in other words, the type of slippery slope argument that should be rejected out of hand.

10. In point of fact, the intrusion was more significant than the majority indicates. First, the majority states the court found the trespass "not to be more than two or three feet." (Draft p. ―― of 182 U.S.App.D.C., p. 842 of 561 F.2d.) The court never made such a finding: the trial judge merely observed that the Government counsel was standing two or three feet from a certain object while he was attempting to demonstrate the geography of the relevant house. M.T. Nov. 1, p. 105. Contrary

to the majority's assertion, Officer Simms testified that he "stepped over about five steps or five feet" to reach the window. M.T. Nov. 1, p. 22.

Second, in the circumstances of this case, it defies reality to measure the trespass from the front porch rather than from the sidewalk running parallel to the street. Although it apparently had been assumed throughout the course of litigation that the officers could have walked to the front door to ask questions, they did not do so nor does the record suggest any intent on their part to do so. In fact, the Government supplemental brief contends that it is "ludicrous" to suggest that they should have done so. Govt.Supp.Br. p. 10. A fair reading of the record suggests that if the officers were insistent on corroborating the anonymous tip, the only way they could have done so was by trespassing. This case therefore differs from *Conner* and *Hanahan* where the officers trespassed inadvertently and imperceptibly. *See Coolidge v. New Hampshire*, 403 U.S. 443, 470, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1970). The fact that the officers here could walk to the window on cobblestone rather than on tulips is immaterial in measuring the substantiality of their intentional intrusion.

intendment of the Fourth Amendment." (Leventhal concurring p. —— of 182 U.S. App.D.C., p. 845 of 561 F.2d). However, I disagree with his conclusion that we should not determine the legality of the window search because the record does not adequately disclose whether the officers invaded reasonable expectations of privacy.[11] In my view, the sparseness of the record on this point is attributable to the government's failure to demonstrate the applicability of the "plain view" doctrine. Most of us, I would submit, would expect that our actions are private when they can only be observed by trespassing prowlers. This would be especially true in the middle of the night.[12] I believe most people would be so disturbed at the sight of a face peering through their basement window in the middle of the night that they would call the police; after today's decision, the police may already be there.

Ironically, this case turns the development of the Fourth Amendment straight on its head. At one time it was thought that the Fourth Amendment only forbade physical trespasses, *e. g. Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944. More recently, the Supreme Court has come to view the protection of the Fourth Amendment more expansively, holding that people and not places come within its ambit.

*Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Although the law of trespass formed the bedrock on which these subsequent expansions rest, the majority today in effect states that a person does not always have a reasonable expectation that he will not be spied upon by a trespassing police officer, thereby converting an expansion of the Fourth Amendment into a contradiction. Contrary to the majority, I think it is reasonable for a person to expect his activities to be safe from the eye of a person who must trespass to view him.[13] In light of the narrowness of the warrant exceptions, I doubt the government would ever be able to justify a search on plain view grounds when it was necessary for the officer to trespass in order to achieve the view.

## CONCLUSION

In certain respects this case is not an appealing one in which to dissent, there being little doubt that the appellant committed the offense charged. Nevertheless, a search is not to be upheld because of what it discloses. I understand my brethren's reluctance to let the offender escape the law because "the constable blundered." When the Supreme Court created the exclusionary rule it did so reluctantly. It had no authority to discipline the law enforcement

---

11. Nor would it be appropriate as Judge Leventhal suggests, p. —— of 182 U.S.App.D.C., p. 845 of 561 F.2d, n.1, to avoid decision on the window search because of the inadequacy of the record regarding a possible analogy to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). As I noted in n.9, *supra*, I neither read the majority as making such an argument, nor find such an argument persuasive in theory.

12. In a similar case several years ago, Judge Wright found it equally difficult to take seriously a government claim that officers had merely observed damaging evidence was in plain view. His words are instructive:

> Certainly no one bent on crime is knowingly going to expose to the public the evidence to convict. Here the evidence was locked in a garage, so any suggestion that appellant knowingly exposed it to the public (or the police) would be absurd.

*United States v. Wright*, 146 U.S.App.D.C. 126, 136, 449 F.2d 1355, 1365 (1971) (dissenting

opinion). For better or for worse, the Fourth Amendment protects the guilty as well as the innocent. I find these words applicable in this case as well.

13. *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300, does not sanction such a contraction. In *Santana* the Court held that a woman who was standing in a doorway visible to the street was in a "public place" and therefore susceptible to warrantless arrest upon probable cause. Quoting *Katz*, 389 U.S. at 351, 88 S.Ct. 507 and citing *Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924), the Court noted that it was immaterial that the police initially spotted the woman when she was on private property because she had "knowingly" exposed herself to the public. As the citation of *Hester*, in which open fields were held to be unprotected by the Fourth Amendment, even when privately owned, makes clear, *Santana* in no way cuts back on *Katz*.

authorities; so to keep the Fourth Amendment from becoming a dead letter because of law enforcement lawlessness its hard choice was to adopt the rule. The rule exacts a high price which can be avoided if either the executive or legislative branches were to put teeth into the Fourth Amendment. Although the courts have long sought help in protecting the Fourth Amendment, neither the legislative or executive branches have taken effective steps to discipline or penalize the offending law officers. Absent such steps, the courts must forthrightly choose either to abandon the Fourth Amendment or refuse to place their imprimatur on its violation.